FILED

David J. Vendler, Esq., State Bar No. 146528
MORRIS POLICH & PURDY LLP
1055 West Seventh Street, 24th Floor
Los Angeles, California 90017
Telephone:   (213) 891-9100
Facsimile:   (213) 488-1178
E-Mail:   dvendler@mpplaw.com

2008 JAN 16  PM 4: 23

CLERK U.S. DISTRICT COURT
CENTRAL DIST. C  CALIF.
LOS ANGELES

BY_____

Richard T. Baum, Esq., State Bar No. 80889
LAW OFFICES OF RICHARD T. BAUM
2215 Colby Avenue
Los Angeles, California 90064
Telephone:   (310) 277-2040
Facsimile:   (213) 286-9525
E-Mail:   rickbaum@hotmail.com

Attorneys for Plaintiffs
FILEMON CONSOLACION, MARTHA
PLEITEZ, GRACIELA RUBALCABA,
DIANA JAPENGA and CARMEN
PRESTON-FOO, individually, and on behalf
of the classes of similarly situated persons,
and the general public

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

FILEMON CONSOLACION, MARTHA
PLEITEZ, GRACIELA RUBALCABA,
DIANA JAPENGA and CARMEN
PRESTON-FOO, individually, and on
behalf of the classes of similarly situated
persons, and the general public,

Plaintiffs,

vs.

PLEASANT CARE CORPORATION; SNF
PROPERTIES, INC.; PCC HEALTH
SERVICES, INC.; ATLAS CARE
ENTERPRISES, INC.; EMBER CARE
CORPORATION; JOSEPH C. TUTERA;
THE TUTERA GROUP, TUTERA
HEALTH CARE SERVICES, L.L.C.; LTC
SERVICES, L.L.C.; BRIDGE
HEALTHCARE FINANCE LLC; BRIDGE
OPPORTUNITY FINANCE LLC;
EMANUEL I. BERNABE; and Does 1-50,

Defendants.

Case No.: **CV08-00281** MMM
(CW)

**CLASS ACTION/REPRESENTATIVE
COMPLAINT**

1

## GENERAL ALLEGATIONS

Now come plaintiffs FILEMON CONSOLACION, MARTHA PLEITEZ, GRACIELA RUBALCABA, DIANA JAPENGA and CARMEN PRESTON-FOO (hereinafter "plaintiffs"), who, on behalf of themselves and all others similarly situated, complain against PLEASANT CARE CORPORATION; SNF PROPERTIES, INC.; PCC HEALTH SERVICES, INC.; ATLAS CARE ENTERPRISES, INC.; EMBER CARE CORPORATION (collectively "the Pleasant Care family of companies"); JOSEPH C. TUTERA; THE TUTERA GROUP; TUTERA HEALTH CARE SERVICES, L.L.C., LTC SERVICES, L.L.C. (collectively referred to as "the Tutera defendants"); BRIDGE HEALTHCARE FINANCE LLC and BRIDGE OPPORTUNITY FINANCE LLC (hereinafter collectively "Bridge"); and EMANUEL I. BERNABE, as follows:

## INTRODUCTION

1.     Plaintiffs are bringing this action for equitable relief and to recover their actual and consequential damages caused by the unlawful interference with their employment contracts and relationships through the unilateral and ***retroactive*** cancellation of plaintiffs' health care benefits program (and failure to pay claims) without providing plaintiffs with any opportunity to obtain COBRA or any other replacement coverage and in failing to pay wages due.

2.     As a direct and proximate result of the defendants' actions, *and through absolutely no fault of the plaintiffs*, plaintiffs are now facing: (1) personal responsibility for medical bills (in some cases exceeding tens of thousands of dollars) that should have been covered under their health insurance, (2) the consequences of the interference with their employment contracts that each of them enjoyed, (3) the ruination of their credit because of their inability to pay their uncovered medical expenses, (4) all of the problems that come with a lapse in health coverage, including being unable to secure new health coverage without significant limitations, or having to pay a significantly

greater cost for new coverage, (5) lost wages, and (6) severe emotional distress from all of the above.  Further, as a direct and proximate result of the delay in payment of plaintiffs' medical expenses, the bills themselves have been rendered substantially more expensive because they no longer qualify for the group discounts that applied when those expenses were timely paid through the health plan.

## JURISDICTION AND VENUE

3.     This Court has jurisdiction, and venue lies in this Court, pursuant to Sections 502(e) and (f) of ERISA, 29 U.S.C. §§1132(e) and (f) and under 29 U.S.C. § 2104, 28 U.S.C. § 1331 and 28 U.S.C. Section 1367 and the fact that many of the events described herein took place within this District.

## CLASS DEFINITIONS

4.     Plaintiffs are bringing this action on behalf of themselves and the proposed class of all persons, who, like them, were either non-union employees of Pleasant Care Corporation (hereinafter "Pleasant Care"), or one of the Pleasant Care family of companies, after March 22, 2007, (or a covered as a dependant of one of those persons and who were entitled to benefits under the employee's health care benefits plan), and who incurred medical bills eligible for payment under the Pleasant Care family of companies' self-funded health care benefits program, but which were not paid by Pleasant Care or any of the Pleasant Care family of companies (hereinafter referred to as "the defined class").

5.     The defined class also includes, but is not limited to, the subclass of Pleasant Care employees and employees of the Pleasant Care family of companies (and their dependants) who suffered injury or are entitled to legal or equitable relief resulting from the employee's not being provided notice pursuant to 29 U.S.C. § 1166 of their COBRA rights and who were entitled to be provided notice of COBRA rights due to a

1  qualifying event pursuant to 29 U.S.C. § 1163(a) (hereinafter referred to as "the
2  COBRA subclass")

3      6.    The defined class also includes, but is not limited to, the subclass of
4  Pleasant Care employees and employees of the Pleasant Care family of companies who
5  were not provided notice in advance of their termination of employment, but who were
6  entitled to such notice under the federal Worker Adjustment Retraining And
7  Notification Act (29 U.S.C. § 2101 et seq.) ("the WARN subclass").

8      7.    The defined class also includes, but is not limited to, the subclass of
9  Pleasant Care employees and employees of the Pleasant Care family of companies who
10 were not provided notice in advance of their termination of employment, but who were
11 entitled to such notice under the Worker Adjustment Retraining And Notification Act
12 (*California Labor Code* § 1400 ("the California WARN subclass").

13     8.    The defined class also includes, but is not limited to, the class of persons
14 who were employees of Pleasant Care or the Pleasant Care family of companies who
15 suffered damages as a result of not being paid wages due to them, including accrued
16 vacation and sick pay.

17
18                                                   **PARTIES**
19 **A.**    **PLAINTIFFS**

20     9.    Plaintiffs Filemon Consolacion, Martha Pleitez, Carmen Preston Foo,
21 Diana Japenga and Graciela Rubalcaba are all individuals and all were employees of
22 one or more of the Pleasant Care family of companies and were eligible participants in,
23 or, beneficiaries under, the Pleasant Care and/or the Pleasant Care family of companies'
24 health care benefit program.  They are also all members of the defined class.

25     10.    Plaintiffs Consolacion, Pleitez, Japenga, and Rubalcaba all live in Los
26 Angeles County.  Plaintiff Preston Foo resides in San Francisco County.
27 ///
28 ///

4

**B.   DEFENDANTS**

11.   Defendant Emanuel Bernabe is alleged to be an individual residing in the County of Los Angeles.

12.   Defendants Pleasant Care Corporation; SNF Properties, Inc.; PCC Health Services, Inc.; Atlas Care Enterprises, Inc.; Ember Care Corporation are all alleged to be California corporations operating and doing business in California.

13.   Defendant Joseph C. Tutera is alleged on information and belief to be an individual residing in the state of Missouri and is the manager of defendant LTC Services, L.L.C. It is further alleged that by virtue of the nature of the work he agreed to do for Pleasant Care and the Pleasant Care family of companies in the retention agreement, defendant Joseph C. Tutera has subjected himself to the jurisdiction of this Court.

14.   Defendants LTC Services, L.L.C. and Tutera Health Care Services LLC are alleged on information and belief to be Missouri limited liability corporations with their principal places of business located at Kansas City, Missouri.  It is further alleged that these entities operate as an arm of the Tutera Group, which plaintiffs allege is a set of affiliated companies that is controlled by Joseph Tutera.  Plaintiffs are currently unaware of all the entities that comprise the Tutera Group and will seek to amend this complaint when such names are ascertained.

15.   Defendant Bridge Healthcare Finance LLC a Delaware limited liability company in the business of, *inter alia*, providing financing to operators of long term care facilities such as Pleasant Care and the Pleasant Care family of companies and was, on information and belief, with Defendant Bridge Opportunity Finance LLC, the largest secured creditor of Pleasant Care and the Pleasant Care family of companies at the time of its bankruptcy filing.

16.   Defendant Bridge Opportunity Finance LLC is a Delaware limited liability company in the business of, *inter alia*, providing financing to operators of long term care facilities such as Pleasant Care and the Pleasant Care family of companies and was,

on information and belief, with Defendant Bridge Healthcare Finance LLC, the largest secured creditor of Pleasant Care and the Pleasant Care family of companies at the time of its bankruptcy filing.

## C.   CLASS ALLEGATIONS

17.   Plaintiffs bring this action pursuant to Rule 23(b)(1), (b)(2), and/or (b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and the defined class.

18.   Joinder of the numerous members of the defined class would be impracticable, as there are approximately 1,300-1,500 class members.

19.   Plaintiffs' claims are typical of those of the members of the defined class in that: (1) their claims arise from the same non-payment of claims and the same fraudulent concealments regarding health insurance as do the claims of other class members; and (2) Defendants' conduct which plaintiffs challenge is the same conduct that has adversely affected the other class members.

20.   Plaintiffs will fairly and adequately represent the interests of the proposed class and sub-classes because their claims are the same as those of the members of the class, and because they have secured the representation of attorneys who are skilled and knowledgeable in pursuing litigation of this kind.

21.   This action is maintainable as a class action under Federal Rule of Civil Procedure 23(b)(2) since the unlawful actions of defendants, as alleged herein, have been taken on grounds equally applicable to all members of the class, thereby making appropriate final injunctive/equitable relief and/or corresponding declaratory relief with respect to the class as a whole.

22.   Alternatively, this action is maintainable as a class action under Federal Rule of Civil Procedure 23(b)(3), as the common questions of law and fact predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

23.   Alternatively, this action is maintainable as a class action under Federal Rule of Civil Procedure 23(b)(1), as the prosecution of separate actions by or against

1  individual members of the class would create a risk of (a) inconsistent or varying
2  adjudications with respect to individual members of the class that would establish
3  incompatible standards of conduct for the party opposing the class, or (b) adjudications
4  with respect to individual members of the class which would as a practical matter be
5  dispositive of the interests of the other members not parties to the adjudications or
6  would substantially impair or impede their ability to protect their interests.

7

8                              **STATEMENT OF FACTS**

9      24.    Plaintiffs are all former non-unionized employees of Pleasant Care, or the
10  Pleasant Care family of companies.   While the Pleasant Care family of companies
11  consists of five ostensibly separate corporations, plaintiffs allege that there is no
12  separateness among them and that each is the alter ego of the other and of defendant
13  Bernabe such that the separateness of the organizations has ceased and that it would be
14  inequitable to recognize the separateness of the 5 organizations for this case.

15     25.    Plaintiffs make this allegation based on the fact Pleasant Care has admitted
16  in papers filed in its own bankruptcy case that "Debtors [namely, the Pleasant Care
17  family of Companies] essentially operate as one consolidated business entity [and] there
18  is one group of management for all five Debtors."

19     26.    Further, it is alleged that there is a unity of ownership of all the entities by
20  defendant Bernabe except for that defendant Bernabe owns only 94 percent of Ember
21  Care Corporation.  However, it is alleged that even with respect to that entity, defendant
22  Bernabe controlled all of its activities prior to the bankruptcy filing and that there is no
23  separateness between that entity and any other member of the Pleasant Care family of
24  companies.

25     27.    Thus, it is alleged that all of the members of the Pleasant Care family of
26  companies comprise a commercial enterprise and that they share lawyers and
27  accountants.

28

28.     Prior to and after its bankruptcy, the Pleasant Care family of companies was a single commercial enterprise/organization which operated a number of long-term health care facilities throughout California.  At the time it filed for bankruptcy, it is alleged that it had approximately 3,500 employees.  In its bankruptcy, Pleasant Care claimed that approximately 40% of these employees were non-union employees and thus members of the defined class.  In other words, it is estimated that the members of the defined class exceed 1,000 persons and that the members of each of the subclasses number in the several hundreds if not over 1,000 persons.

29.     As part of their compensation, plaintiffs and the members of the defined class were provided health care benefits pursuant to a self-funded health care benefit program (hereinafter sometimes referred to as "the plan" or "health care benefit program") that was created under the control of defendant Bernabe in or about February 2007, approximately one month prior to Pleasant Care and the Pleasant Care family of companies' filing for bankruptcy protection.

30.     Under the self-funded plan, instead of paying premiums to an insurance company, Pleasant Care and the Pleasant Care family of companies undertook the risk of paying all of the covered claims of its employees from its own funds.  (Even prior to establishing the particular self-funded health care benefit program out of which this case arises, the members of the Pleasant Care family of companies had operated under a different self-funded health care benefit program).

31.     While the health care benefit program established in February 2007 was self-funded, Pleasant Care and the Pleasant Care family of companies did not actually process the medical claims that employees incurred.  Rather, the Pleasant Care family of companies contracted with a third party administrator ("TPA" in the parlance of the industry), Delta Health Systems ("Delta") to maintain eligibility information and process and administer the claims as they came in.

32.     It is alleged on information and belief that when claims were presented to Delta by the employees' medical care providers, Delta would, on a periodic basis,

1    process the claims and send invoices to the Pleasant Care family of companies for the

2    cost of the medical services.  Delta, of course, also charged an administrative fee for its

3    services.

4        33.   It is further alleged on information and belief that either Delta or the

5    Pleasant Care family of companies had a contractual arrangement with Blue Cross

6    whereby employees were able to use Blue Cross's group of doctors and discounted

7    medical rates and their medical insurance cards bore the Blue Cross emblem.  Thus, it is

8    alleged that some or all of the members of the class had no knowledge that their health

9    insurance plan was self-funded and was not backed by a traditional insurance company.

10       34.   In or about March 23, 2007, Pleasant Care and the Pleasant Care family of

11   companies filed for Chapter 11 bankruptcy protection.

12       35.   Shortly after Pleasant Care and the Pleasant Care family of companies filed

13   their Chapter 11 petition, it is alleged on information and belief, that the major creditors

14   of Pleasant Care and the Pleasant Care family of companies used their leverage to force

15   Pleasant Care and the Pleasant Care family of companies to engage defendant Joseph

16   Tutera, The Tutera Group, and LTC Services, L.L.C ("the Tutera defendants") to take

17   over the management and operation of Pleasant Care.  However, it is alleged on

18   information and belief that none of the Tutera defendants ever took over from defendant

19   Bernabe as named fiduciary for the plan.  However, it is alleged that defendant Joseph

20   C. Tutera took over complete operating control of the health care benefits program and

21   was thus a fiduciary of the health care benefits program under ERISA even though he

22   was not named as such by the health care benefits program documents.  It is further

23   alleged that every action of Pleasant Care and the Pleasant Care family of companies

24   that is described herein was committed under the direction of the Tutera defendants and

25   Joseph Tutera.

26       36.   However, it is further alleged that even after defendant Bernabe was

27   replaced by defendant Joseph C. Tutera as the person in actual control of Pleasant Care

28   and the Pleasant Care family of companies, defendant Bernabe remained the named

9

1   administrator/fiduciary of the plan and thus continued to owe fiduciary duties to the
2   members of the defined class during all times relevant herein.

3       37.    Despite the fiduciary obligations he owed, defendant Bernabe did nothing
4   to fulfill his fiduciary duty to keep abreast of the operations of the Pleasant Care Family
5   of Companies as it related to the plan, and/or provide notice to the members of the
6   defined class of any danger that Pleasant Care and the Pleasant Care family of
7   companies were not going to meet their obligations to fund the health care benefit
8   program.

9       38.    Among the principal reasons the Tutera defendants were selected by the
10  creditors to take over management was that the Tutera defendants advertise and sell
11  themselves as specializing in and having unique abilities to take over the management
12  of long-term care facilities in financial distress.  As set forth on its Internet web page,

13          "Tutera Health Care Services, L.L.C. and its various affiliates (collectively,
            "Tutera"), have assisted numerous owners, indenture trustees, bondholders,
14          and lenders of health care facilities by consulting, managing, providing
            working capital financing, and acquiring health care facilities that may have
15          defaulted on their obligations to creditors or filed a chapter 11 bankruptcy
            proceeding...  Below is a list of various matters involving health care
16          facilities which have defaulted on their respective debt obligations or filed a
            chapter 11 proceeding in which Tutera has headed up an effort to maximize
17          the return to bondholders, creditors, and the owner."

18      39.    It is further alleged on information and belief that when Pleasant Care filed
19  its bankruptcy petition, the major creditors of Pleasant Care, including the Bridge
20  defendants, in conjunction with the Tutera defendants, determined that more money
21  could be secured from Pleasant Care's estate by continuing to operate, and having the
22  Tutera defendants try to sell off various of the nursing home assets while they were in
23  operating condition, than would be the case if Pleasant Care simply ceased all of its
24  operations.

25      40.    Attached hereto as Exhibit "A" and incorporated herein by reference are
26  certain materials submitted by the Tutera defendants in their effort to secure the
27  management contract for the Pleasant Care family of companies.  Among the various
28  representations made in these materials are the following:

It is Tutera's philosophy that the accounting function be separated from the operations or administration of the facility. The accounting function is designed to gather information of (sic) the facility's day to day operations. This information, when routed through the appropriate channels, provides the data required for the accurate production of financial statements. Through the processing of this information, vital operating statistics are then relayed back to the facility and its regional staff for accountability to various operating performance benchmarks.

The Accounts Payable function is accomplished through batching from the facility to the Tutera Home Office in Kansas City on a weekly basis. The purchasing and approval of invoices (*including, presumably those from Delta Health Systems*) originates in the facility where the services are incurred and/or services have been provided. Approval and coding of the invoices is accomplished in the field level and signed off by the Facility Administrator before transmitting to Kansas City. Kansas City verifies for appropriate documentation before processing the invoices and performs certain control tasks.

The payroll function (*where the members of the defined class had their health insurance payments withheld until August 15, 2007*) is handled in a similar manner with a transmittal being sent from the Kansas City office to the Field for completion and then returned back to the Kansas City office for processing.

Tutera distinguishes itself from other management companies by its interactive budgeting systems. The Budget is broken down into five categories: Revenues, Labor, Discretionary Purchases, Non-Discretionary Purchases, and Ancillary expenses... The Labor component is developed from the facility's actual staffing patterns and tied back to the facility's schedule... A grid is established for each payroll department, identifying the number of hours associated with various census levels. The hours are associated with the weighted average cost per hour for employees within this department... Payroll related expenses; i.e., payroll taxes, workers' compensation, and benefits (vacation, holiday, and sick pay) are based on a percentage of actual wages projected per the labor grid.

By putting these systems in place, the facility administration and the management are allowed to concentrate on labor first on a daily and by-payroll basis, identifying 70% of the facility's expenses and 90% of the facility's discretionary expense categories.

Daily, weekly, and monthly operating and management reports are available and are utilized to compare actual performance results to projected budgeted results.

41. As can be seen, the Tutera defendants collectively advertise that among their strengths is the control over accounting and weekly review of accounts payable in their centralized Kansas City offices. Indeed, that all accounts payable are batched and sent to Kansas City precisely so that no mistakes are made in failing to pay invoices and payroll. Further, there is no attempt to separate among the Tutera defendants which

11

1  functions are performed by which entities that are referred to collectively as the Tutera

2  Group in the Tutera marketing materials that were submitted to the bankruptcy court in

3  order to secure the retention agreement.

4      42.    Attached hereto as Exhibit "B" and incorporated herein by reference is the

5  retention agreement between the Tutera defendants and the Pleasant Care family of

6  companies. It is further alleged that while Joseph Tutera was retained by to take over as

7  the President and Chief Operating Officer for Pleasant Care and the Pleasant Care

8  family of companies, he was retained as such specifically on the representation that he

9  was pledging the support of his entire organization, including all of the Tutera

10  defendants. It is also alleged that during the entire time that Joseph Tutera has been

11  acting as President and Chief Operating Officer for Pleasant Care and the Pleasant Care

12  family of companies, he has maintained total and complete control over all material

13  decisions affecting Pleasant Care and the Pleasant Care family of companies. The fee

14  the Tutera Group has charged on a monthly basis for "maximizing the return to Pleasant

15  Care's creditors" has been $125,000 per month. The retention agreement does not

16  specify, however, that defendant Joseph Tutera, or any of the Tutera defendants was

17  going to assume the role of fiduciary for the self-funded health care benefit program.

18      43.    It is alleged that upon taking over Pleasant Care's management the Tutera

19  defendants undertook to review Pleasant Care's financial condition, including the past

20  monthly inflows and outflows of funds. These inflows and outflows included, but of

21  course were not limited to, the health care benefit program payments made to Delta

22  Health Systems. It is further alleged that the Tutera defendants were told about the self-

23  funded health care benefit program from interviews that its personnel conducted with

24  the Pleasant Care family of companies' pre-bankruptcy management team members and

25  in communications had with representatives of Delta.

26      44.    It is further alleged that this sort of review of Pleasant Care's pre-

27  bankruptcy financial condition would be part of the standard operating procedure for

28

1    any company in the Tutera defendants self-defined area of specialty, i.e. taking over and

2    operating distressed health care facilities.

3    45.   These facts all lead to the inescapable conclusion that the Tutera

4    defendants fully comprehended the exact nature of the self-funded health care benefit

5    program that was in place when the Tutera defendants were retained to conduct the day-

6    to-day management of Pleasant Care and the Pleasant Care family of companies.

7    46.   In the initial days of its bankruptcy case, Pleasant Care and the Pleasant

8    Care family of companies moved the court for permission to use the cash collateral of

9    its secured creditors.  As a normal part of the filing of these motions, Pleasant Care and

10   the Pleasant Care family of Companies drew up a projected budget of income and

11   expenses, and proposed that it would stay within those budgetary guidelines as a

12   condition for the use of the cash collateral.

13   47.   On information and belief, it is alleged that it soon became apparent that

14   merely using cash collateral would not be sufficient since the facilities were operating at

15   a loss, and that additional financing was required, Pleasant Care and the Pleasant Care

16   family of companies entered into a new lending and cash collateral agreement with

17   Bridge, and obtained bankruptcy court approval for those financing arrangements.

18   However, all such agreements presupposed that ordinary and necessary administrative

19   expenses would continue to be paid in the ordinary course.

20   48.   Despite the fact that Bridge, as of the commencement date of the

21   bankruptcy proceeding was the largest and controlling secured creditor of Pleasant Care

22   and the Pleasant Care family of companies, plaintiffs allege, on information and belief,

23   that the agreements likely provided Bridge with the right to cut off financing and to

24   prohibit payment of any administrative expense after the sale of the various facilities.

25   However, it is alleged that the purported right of Bridge to cut off funding was neither

26   explained to the bankruptcy court, to the creditor body, to administrative suppliers and

27   vendors, and, most importantly, it was not explained to the employees, who were

28   depending on their health care benefit program during their tenure of employment and

CLASS ACTION/REPRESENTATIVE COMPLAINT

1   who were relying upon the other benefits due to them under their employment
2   contracts, including accrual of vacation and/or sick pay and other wages.  Indeed, the
3   budgets that were submitted to the bankruptcy court and approved by that court all
4   included provisions for payments to Delta and for payment of wages.  But then, despite
5   the budgets being approved by the bankruptcy court, the Tutera defendants did not
6   continue to pay Delta for claims and did not provide Delta with any eligibility
7   information as specified in the following paragraphs.  Further, as employees ceased to
8   become employed, they were not paid their accrued vacation/sick time.

9       49.    In order to implement the plan that had been agreed upon between the
10   Tutera defendants and the major creditors of Pleasant Care and the Pleasant Care family
11   of companies, namely to sell off the various nursing home assets as operating concerns
12   so as to "maximize return to the creditors," in this case principally Bridge, the Tutera
13   defendants knew that Pleasant Care's employees, including the members of the defined
14   class needed to be kept working and further needed to be kept complacent and secure in
15   their positions.  The Tutera defendants knew that if the employees started to leave *en*
16   *masse* for any reason, Tutera's plan to keep the facilities operational so that they could
17   be sold for maximum dollar value would not work, and thus, that the secured creditors
18   to whom the Tutera defendants were obliged for their continued employment would not
19   be paid, and Tutera would lose its management fee.

20       50.    Notwithstanding the Tutera defendants' full knowledge of the
21   consequences to the members of the defined class, plaintiffs allege that prior to July 1,
22   2007, the Tutera defendants caused Pleasant Care and the Pleasant Care family of
23   companies to cease paying employee claims presented by Delta.  Further, as of
24   approximately July 1, 2007, and at the specific instruction of the Tutera defendants,
25   Pleasant Care and the Pleasant Care family of companies also ceased providing any
26   information to Delta regarding the eligibility of employees for the health care benefit
27   program.  These actions taken by the Tutera defendants meant that Delta could no
28   longer process claims of third party providers for treatment and services provided to the

14

1   members of the defined class and could no longer even determine who was even
2   eligible under the health care benefits program as a participant or beneficiary.

3        51.    On or about July 2-3, 2007, and consistent with the Tutera plan to sell off
4   the facilities as operating concerns, an auction was held to sell off certain of the
5   Pleasant Care facilities.  It is alleged that this auction resulted in millions of dollars
6   being raised for the benefit of creditors and principally Bridge, and that without these
7   funds, the secured creditors of Pleasant Care and the Pleasant Care family of companies
8   would not have recovered back nearly as much of the debt owed to them.

9        52.    It is alleged both prior to and after July 1, 2007, Delta personnel
10  communicated repeatedly with both defendant Joseph C. Tutera and Ron Cork (which
11  plaintiffs allege on information and belief was employed by a Tutera defendant) that
12  their conduct in ceasing to pay claims and to provide eligibility information was in
13  direct violation of ERISA and that they could be personally liable therefore.

14       53.    It is alleged that despite these numerous requests, demands and warnings
15  by Delta personnel to the Tutera defendants, it was consciously determined by the
16  Tutera defendants to continue to refuse to pay the invoices or provide the eligibility
17  information that was being requested by Delta so as to preserve capital thereby
18  "maximizing the return to creditors," and principally Bridge.  Likewise, it was
19  determined that accrued wages, including but not limited to accrued vacation and sick
20  pay should not be paid to employees whose employment was being terminated as part
21  of the sales, or otherwise.  Plaintiffs further allege that these actions were taken with
22  *absolute full awareness* of the dire consequences that would result to the members of
23  the defined class and the emotional distress that it would cause to all members of the
24  defined class.

25       54.    Worse still, and as further evidence of their deliberate intent to conceal
26  from the members of the defined class that their health benefits program was worthless
27  is the fact that the Tutera defendants, while not paying the medical claims of the
28  members of the defined class, and not providing eligibility information to Delta,

1  nonetheless continued to have Pleasant Care and the Pleasant Care family of companies
2  take from the members of the defined class, their medical insurance payroll deductions
3  all the way through August 15, 2007.

4      55.    The last payroll deduction taken from the members of the defined class on
5  August 15, 2007 was taken more than 45 days *after* the Tutera defendants had already
6  ceased paying any health insurance claims and exactly 45 days after it ceased providing
7  any eligibility information to Delta for it to even process employee claims.

8      56.    So it is plain, plaintiffs allege that the decision to continue to take out
9  medical insurance payroll deductions from the members of the defined class was
10  deliberately made in aid of the Tutera defendants' plan to intentionally conceal from the
11  employees that their health coverage was worthless until after the employees had served
12  their purpose, i.e. until after the most value had been secured for Pleasant Care's
13  creditors, and principally Bridge, from the sale of the nursing home assets (and until
14  after the Tutera defendants had secured the maximum fee possible for itself).

15     57.    It was only after these sales of assets had been negotiated, and the
16  employees were of no further use to the Tutera defendants' goals, that the Tutera
17  defendants, on or about August 14, 2007, caused a memorandum to be sent by the
18  existing management of Pleasant Care, for the first time telling the members of the
19  defined class that there might be a potential problem with their health care coverage.  It
20  is alleged that this memo was entirely ghost-written by an agent of the Tutera
21  defendants, but that it was sent to the members of the defined class on Pleasant Care
22  letterhead.   A copy of this memorandum is attached hereto as Exhibit "C" and
23  incorporated by this reference.

24     58.    On information and belief another reason that the memorandum was sent
25  to the members of the defined class was that by this time, both employees and providers
26  were beginning to complain to Delta and to Pleasant Care over non-payment of claims
27  and the Tutera defendants were becoming internally concerned that their earlier
28  decisions could come back to haunt them in the form of direct liability.

1    59.    On or about August 22, 2007, a "Certificate of Group Health Plan

2    Coverage" notice was sent to the members of the defined class from Delta. This notice,

3    was the first notice of any kind that the health benefits of the members of the defined

4    class had been retroactively terminated as of June 30, 2007. (Not coincidentally, June

5    30, 2007 was immediately prior to the July 2-3 date when the Pleasant Care facilities

6    were auctioned off).

7    60.    But this notice was not adequate to put a reasonable person on notice that

8    their health benefits had in fact been cancelled retroactively. Indeed, there is only an

9    oblique reference to the "termination date" being June 30, 2007 contained in the final

10   line of the 3 page form. Indeed, this notice, which was simply a notice of HIPPA rights

11   did not even attempt to explain to the members of the class their health insurance had

12   been retroactively terminated or that Pleasant Care was not paying any further claims.

13   Yet, even though this notice was sent by Delta approximately two full months after the

14   Tutera defendants had caused the cessation of any payments to Delta by any of the

15   Pleasant Care family of companies, none of the defendants had yet provided any formal

16   notice to the members of the defined class that their health insurance was being

17   terminated, or that claims would not be paid. A copy of the Delta notice is attached

18   hereto as Exhibit "D" and is incorporated by this reference.

19   61.    As previously alleged, when the Tutera defendants first informed Delta

20   personnel about their intention to retroactively cancel the health care benefits program,

21   they were specifically told that doing so would be in violation of ERISA and that they

22   could have liability for doing so. However, it is further alleged that after Delta told the

23   Tutera defendants that what they were planning on doing was illegal, the Tutera

24   personnel stated that they would consult with Pleasant Care and the Pleasant Care

25   family of companies' counsel, Jacqueline Rodriguez.

26   62.    It is thus alleged on information and belief that Pleasant Care and the

27   Pleasant Care family of companies' bankruptcy counsel, Jacqueline Rodriguez, was in

28   fact made aware by the one or more of the Tutera defendants' employees of the

1   retroactive cancellation plan prior to its implementation and made no effort to stop the
2   Tutera defendants from implementing that plan in complete derogation of her duty to
3   Pleasant Care and the Pleasant Care family of companies..

4       63.   It is further alleged that Ms. Rodriguez also became aware of the fact in
5   June 2007 that the Tutera defendants were preventing Pleasant Care and the Pleasant
6   Care family of companies from providing eligibility information to Delta and were also
7   not allowing any payments of any employee claims after June 30, 2007.  It is also
8   alleged that through Delta, the Tutera defendants and Ms. Rodriguez, were made
9   specifically aware of the fact that a delay in payment of claims by Pleasant Care and the
10  Pleasant Care family of companies could substantially increase Pleasant Care's
11  financial exposure to employee medical claims because after a certain number of days
12  of non-payment, the medical care providers would no longer allow the Blue Cross
13  discount that would otherwise apply if Delta were promptly paid by Pleasant Care and
14  Delta  in turn promptly paid the providers.  The Tutera defendants were also made
15  aware by Delta that this same increased liability arising from the delay in payments by
16  Pleasant Care and the Pleasant Care family of companies would also result in the same
17  dramatic increase in exposure to the members of the defined class, because they had
18  almost certainly agreed, as part of their contract with their medical care providers, to be
19  ultimately responsible for all charges if for any reason their insurance coverage did not
20  pay for any portion of the bill.

21      64.   It is alleged that Pleasant Care's bankruptcy counsel, however, consistently
22  acceded to the Tutera defendants' and the Bridge defendants' plan to cease providing
23  eligibility information in June of 2007 and the plan to stop paying claims timely and
24  ultimately the decision to retroactively cancel the employees' health care benefits
25  program.  These decisions not only damaged the defined class, but also damaged
26  Pleasant Care and the Pleasant Care family of companies by increasing its liability.

27      65.   Plaintiffs further allege that since the health care benefits program was
28  retroactively cancelled to June 30, 2007, from that point forward, there was no plan in

18

1   existence and that therefore ERISA does not bar any state law claims from being

2   asserted against any of the defendants for their actions as alleged herein after June 30,

3   2007. However, if plaintiffs' position in this regard is not accepted as legally correct,

4   plaintiffs allege alternatively that the retroactive cancellation of the health care benefits

5   program was undertaken in direct violation of ERISA and in breach of the ERISA

6   fiduciaries' fiduciary duties.

7       66.   It is further alleged that the Tutera defendants knew full well the

8   consequences that would befall the members of the defined class (and the similarly

9   situated unionized employees as well who are not part of this complaint), i.e. that their

10  claims would not be paid, that their level of financial exposure would increase because

11  of untimely payment, that they would be eventually targeted for collection by the health

12  care providers, that they would suffer a break in coverage, and would, potentially end

13  up in extreme financial distress.   This is especially so since many members of the

14  defined class are largely of modest means and sophistication, and have limited ability to

15  speak and read English.   However, for the Tutera defendants and the Bridge defendants,

16  ensuring that Pleasant Care's employees continued to have their health insurance claims

17  paid and otherwise have their employment contracts honored, including payment of

18  vacation pay and other benefits that were part of their employment contracts, was

19  antithetical to maximizing creditor returns.

20      67.   Finally, in an effort to limit their exposure to any claims arising from the

21  members of the defined class, the Tutera defendants, again with the full support of

22  Pleasant Care's counsel, obtained a very short time-frame for barring the presentation of

23  any administrative claims (October 1, 2007). This date was obtained without telling the

24  bankruptcy court, which initially approved the bar date, the truth about the claims that

25  were outstanding and that many members of the defined class were not even aware that

26  they had claims because their claims had not yet even been presented for payment by

27  their medical care providers, much less had they been told that the claims were being

28  refused and that their medical care providers would be looking to them for payment.

68.   It is alleged further that defendants Pleasant Care and the Pleasant Care family of companies and defendant Bernabe did nothing to exercise their fiduciary duties to the members of the defined class under the health care benefits program to protect the members of the defined class against the actions that were being taken by the Tutera defendants and the Bridge defendants and/or to safeguard the employees' interests above their own.

69.   Finally, confirming that the Tutera defendants knew that what they had done was wrong, and in an attempt to cover themselves against accusations of fraudulent non-disclosure, on the Wednesday prior to the October 1, 2007 bar deadline for administrative claims (September 25, 2007), the Tutera defendants again caused Pleasant Care to send out a notice, *by regular mail,* (thus assuring that no one would have sufficient time to react), ostensibly telling the members of the defined class of the deadline to file an administrative claim, and at the same time intimidating them from actually doing so by telling them that they would probably face opposition from Pleasant Care if they did file a claim.   The notice further intimated to the members of the defined class that they would need to hire a lawyer, which, given the limited means available to most of the members of the defined class, was tantamount to a gauntlet that the Tutera defendants knew was unlikely to be crossed.   It is again alleged on information and belief that this notice (which is attached hereto as Exhibit "E" and is incorporated herein) was ghost-written by an agent of the Tutera defendants and at the direction of Joseph C. Tutera.

70.   Further, it is alleged that some or all of the Bridge and Tutera defendants may not legally be ERISA entities because they exercised no discretionary authority over the health care benefit program and thus that state law claims may be asserted against them outside of ERISA preemption.   Further, ERISA preemption does not apply to bar the state law claims against the Bridge and Tutera defendants even as to the claims for unpaid wages.

71.     Alternatively, it is alleged that the actions of the Tutera defendants (and even perhaps the Bridge defendants) in ceasing paying claims and retroactively canceling the health care benefit program were fiduciary acts under ERISA and that all of the Tutera and Bridge defendants are covered as fiduciaries under ERISA, or as agents of an ERISA fiduciary, or that the acts described herein were done in conspiracy with Joseph C. Tutera, who was certainly an ERISA fiduciary, to violate ERISA.

72.     The Tutera defendants' conscious and intentional decision to secure as much of a management fee as possible, while enhancing its reputation for "maximizing creditor recovery" at the expense of the members of the defined class by avoiding paying on the health care benefits program while concealing from the employees that it was not paying their claims is willful, malicious, oppressive and shocking to the conscience.

73.     Further, it is alleged that the Bridge defendants intentionally interfered with the employment contracts of the members of the class and that this was done knowingly and with full awareness of the consequences likely to result to the members of the defined class.   The Bridge defendants knew that it was only through the continued work of the members of the defined class that the facilities would stay open and that there would therefore be assets to sell.   The Bridge defendants accepted the benefits of the employees continued labors which were done in reliance on the fact that they would receive their compensation.   Nonetheless, having accepted the benefits of the employees' work, Bridge then assured that the members of the defined class would not get paid their wages and health care benefits by pressuring Pleasant Care and the Pleasant Care family of companies into not paying the sums that were due.   This interference in the employment contracts of the members of the defined class, without whose work, Bridge would have been left with nothing to sell in terms of assets to repay its loans, was willful, malicious, oppressive and shocking to the conscience.

74.     Finally, and also alternatively, even if the Tutera defendants and the Bridge defendants' conduct was not intentionally wrongful, it was nonetheless done with

1   reckless disregard for the consequences and constituted willful egregious misconduct

2   given the job the Tutera defendants were engaged to perform. The facts supporting this

3   conclusion, in addition to what has been alleged above, include that Delta Health

4   Systems regularly sent invoices to Pleasant Care relating to the amount of monies that

5   were owed pursuant to the health care benefits program. It is alleged that these invoices

6   were regularly received by the Tutera defendants and that the Tutera defendants, one

7   way or another, failed to pay those invoices.

8        75.   Indeed, it is alleged that these invoices from Delta Health Systems were

9   part of the accounts payable data that was being batched and sent to Kansas City on a

10   weekly basis (as set forth in the Tutera defendants' materials submitted to obtain the

11   management contract).

12        76.   Further, it is alleged that the Tutera defendants should have become aware

13   of the full nature of the health care benefit program in any event when they took over

14   the management of the enterprise from their review of past payments that had been

15   made by Pleasant Care to Delta over the course of its operations.

16        77.   It is further alleged that the Tutera defendants should have become aware

17   of the self-funded nature of the health care benefit program since CIGNA, which had

18   been the third party administrator of the health plan prior to Delta Health Systems, had

19   filed a claim against Pleasant Care for monies owed to it for that plan.

20        78.   It is further alleged that the Tutera defendants were under an obligation to

21   report to the United States Trustee the status of all payments and the general financial

22   condition of the debtors post bankruptcy and that in fulfilling that duty, the Tutera

23   defendants would have/should have understood the nature of the health care benefit

24   program that the members of the defined class were operating under and reported to the

25   Trustee at the earliest opportunity that the program would not be adhered to. It is

26   further alleged that Pleasant Care's bankruptcy counsel was also aware of the failure to

27   pay claims and did not inform the bankruptcy court or the U.S. Trustee.

28

79.   It is further alleged that Delta personnel repeatedly informed the Tutera defendants that their conduct was illegal and in violation of ERISA.

80.   Finally, it is alleged that defendant Bernabe continued to own Pleasant Care and was at all times the named fiduciary for the health care benefit program during all of the time alleged herein.  As such, he at all times herein had a fiduciary duty to the members of the plan which he violated by failing to notify the plan members of the fact that the Tutera defendants were responsible for all management decisions involving all aspects of Pleasant Care's health care benefits program, including the decision to terminate the program retroactively and not to pay benefits.

## FIRST CLAIM FOR RELIEF

### (VIOLATION OF ERISA BENEFITS PLANS, ERISA SECTION 502)

*By Plaintiffs Against All Defendants*

81.   Paragraphs 1 through 80 are re-alleged and incorporated herein by this reference.

82.   By retroactively terminating the health care benefit program of the members of the defined class and taking other actions to their prejudice without notice to them, and in failing to pay their claims, all as alleged above, all of the defendants who are determined to be ERISA fiduciaries violated their fiduciary duties to the members of the defined class in an egregious and oppressive manner.

83.   It is further alleged that the defendants who were not ERISA fiduciaries acted in conspiracy to violate ERISA and/or who knowingly participated in a breach of trust by the ERISA fiduciaries.  These defendants' conduct is therefore actionable under Sections 502(a)(1)(B) and (a)(4) of ERISA, 29 U.S.C. §§1132(a)(1)(B) and (a)(3).

84.   Those statutory provisions state that a participant or beneficiary may bring a civil action "to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan," and further "to enjoin any act or practice

which violates . . . the terms of the plan, or . . . to obtain other appropriate equitable relief . . . to redress such violations or . . . to enforce . . . the terms of the plan."

85.    Defendants' conduct will and has caused irreparable injury to the defined class in the loss of plan benefits all as set forth above. Further, the egregiousness of the conduct demands appropriate curative measures by the Court in equity.

## SECOND CLAIM FOR RELIEF

(VIOLATION OF ERISA BENEFITS PLANS, ERISA SECTION 404 AND 502)

*By Plaintiffs Against All Defendants*

86.    Paragraphs 1 through 80 are re-alleged and incorporated herein by this reference.

87.    The ERISA fiduciary defendants knew prior to July 2007 that the members of the defined class were not going to have their health care expenses paid that were due under the health care benefits program. The ERISA fiduciary defendants concealed this fact and/or failed to disclose this fact to the members of the defined class and their dependents. Indeed, payroll deductions were continued for health care through August 15, 2007. Retroactively terminating the health care benefit program of the members of the defined class and taking all of the other actions described in this complaint amounted to a breach of fiduciary duty to the members of the defined class in an egregious and oppressive manner.   These defendants' conduct thus violates ERISA Section 404(a), 29 U.S.C. §1104(a), which requires ERISA fiduciaries to treat retirees fairly, honestly and without deception or coercion.

88.    It is further alleged that the defendants who were not ERISA fiduciaries acted in conspiracy to violate ERISA and/or knowingly participated in a breach of trust by the ERISA fiduciaries all as specified above.   These defendants' conduct also subjects them to liability for violation of ERISA Section 404(a), 29 U.S.C. §1104(a). The members of the defined class have suffered irreparable loss and hardship resulting

1  from the breach of duty and the egregiousness of the conduct by all of the defendants
2  demands appropriate curative measures by the Court in equity.

3

4  **THIRD CLAIM FOR RELIEF**

5  (EQUITABLE ESTOPPEL)

6  *By Plaintiffs Against All Defendants*

7  89.     Paragraphs 1 through 80 are re-alleged and incorporated herein by
8  reference.

9  90.     To the extent that the defendants, or any of them, purported to, or
10  participated in the retroactive cancellation of the health care benefits of the members of
11  the defined to June 30, 2007, those defendants should be equitably estopped from
12  asserting that any state law fraud/concealment claims that arise from the continued
13  employment of any class member past June 30, 2007 are preempted by ERISA.

14

15  **FOURTH CLAIM FOR RELIEF**

16  (FRAUD)

17  *By Plaintiffs Against All Of The Defendants Except Mr. Bernabe*

18  91.     Paragraphs 1 through 80 are re-alleged and incorporated herein by this
19  reference.

20  92.     As alleged more fully above, the certain of the Tutera defendants and the
21  Bridge defendants may not be fiduciaries under ERISA, or are estopped from asserting
22  that they were fiduciaries after the retroactive termination date of the health care benefit
23  program.

24  93.     Each of these defendants and Pleasant Care and the Pleasant Care family of
25  companies had a pecuniary interest in having the employees of Pleasant Care and the
26  Pleasant Care family of companies continue to work during the period following the
27  filing of the bankruptcy petition so that the facilities could be sold for maximum value.

28

**CLASS ACTION/REPRESENTATIVE COMPLAINT**

1    Each of these defendants thus profited by the labors of the members of the defined
2    class.

3        94.    As soon as these defendants became aware of the fact that there was even a
4    danger that the Pleasant Care health care benefit program (which the members of the
5    defined class were depending on) was not going to be able to respond and pay for the
6    medical claims of the defined class, these defendants had a duty to timely inform the
7    members of the defined class of the facts pertinent to that danger.

8        95.    The same is true with respect to the wages that were owed for vacation and
9    sick time that was accruing with each passing day the employees worked.  It is alleged
10   herein that the decision not to pay the employees' accrued wages was inextricably
11   bound up with and part of the same decision-making process that led to the action of not
12   paying employee health claims as specified herein. As soon as these defendants became
13   aware of the fact that there was even a danger that Pleasant Care and the Pleasant Care
14   family of companies might not pay all accrued wages owed to the members of the
15   defined class, these defendants had a duty to timely inform the members of the defined
16   class of the facts pertinent to that danger.

17       96.    None of the defendants did so.  In fact, these defendants, in concert with
18   each other, actively concealed and/or suppressed material facts about the ability of the
19   Pleasant Care health care benefit program to respond to claims and that the Tutera
20   defendants were precluding those payments in favor of the interests of itself and the
21   Pleasant Care creditors that were their true clients.  As part of the same decision-
22   making process, these defendants failed to disclose to the members of the defined class
23   that they would not be paid their accruing vacation pay.

24       97.    These defendants intentionally concealed or suppressed the facts relevant
25   to the health care benefit program with the intent to defraud plaintiffs and the members
26   of the defined class, namely so that they would continue to work at their jobs and thus
27   allow the Tutera defendants to sell the facilities as ongoing concerns for the benefit of
28   all of these defendants.

1    98.    Plaintiffs and the members of the class were all unaware of the deception

2    being practiced upon them and would not have acted as they did they had known of the

3    concealed or suppressed facts about their health insurance and their wages.

4    99.    As a direct result of concealment or suppression of fact by the Tutera

5    defendants, all as alleged above, plaintiffs have sustained damage and are entitled to

6    punitive damages based on the oppressive and malicious nature of the conduct.

7

8                        **FIFTH CLAIM FOR RELIEF**

9                 (NEGLIGENT MISREPRESENTATION/CONCEALMENT)

10               *By Plaintiffs Against All Of The Defendants Except Mr. Bernabe*

11   100.    Paragraphs 1 through 80 and 93-96 are re-alleged and incorporated herein

12   by this reference.

13   101.    As alleged more fully above, the Tutera and Bridge defendants were either

14   not fiduciaries under ERISA or are estopped from asserting that they were fiduciaries

15   past the retroactive termination date of the health care benefit program.

16   102.    As soon as they became aware of the fact that there was a danger that the

17   Pleasant Care health care benefit program (which the members of the defined class were

18   depending on) was not going to be able to respond and pay for the medical claims of the

19   defined class, and/or that wages were not going to be paid to the members of the

20   defined class, these defendants had a duty to timely inform the members of the defined

21   class of the facts pertinent to that danger.

22   103.    These defendants in fact, however, did not tell the plaintiffs or the

23   members of the defined class about the potential inability of the Pleasant Care health

24   care benefit program to respond to claims and/or that their accrued wages would not be

25   paid.

26   104.    These defendants had a duty of disclosure and negligently failed to

27   disclose the facts relevant to the health care benefit program and the non-payment of

28

1 | accrued wages to the plaintiffs and the members of the defined class until too late to

2 | avoid the damage.

3 |    105.  Plaintiffs and the members of the class were all unaware of the true facts

4 | that should have been disclosed to them and would have acted differently had they been

5 | so informed.

6 |    106.  As a direct result of the non-disclosures by these defendants, all as alleged

7 | above, plaintiffs have sustained damage.

8 |

9 | **SIXTH CLAIM FOR RELIEF**

10 | (VIOLATION OF THE CONSOLIDATED OMNIBUS BUDGET

11 | RECONCILIATION ACT ("COBRA"))

12 | *By Plaintiffs Against All Of The Defendants*

13 |    107.  Paragraphs 1 through 80 are re-alleged and incorporated herein by this

14 | reference.

15 |    108.  The Consolidated Omnibus Budget Reconciliation Act (COBRA) is a

16 | statutory scheme, the purpose of which is to afford employees who lose their job in a

17 | partial layoff continuation medical coverage at approximately the group rate.

18 |    109.  The definition of "employer" applicable to the COBRA is the same as for

19 | ERISA.  It is further alleged that all of the defendants qualify under the definition of

20 | "employer" for the purposes of COBRA to the same extent that it is found that they

21 | qualify as such under ERISA.  It is further alleged that the plan administrator for the

22 | health care benefit program was, at all times relevant hereto, defendant Bernabe.

23 | However, it is alleged that pursuant to the retention agreement, the Tutera defendants or

24 | one of them also may qualify as plan administrator.

25 |    110.  It is alleged that the defendants qualifying as "employers" under the

26 | COBRA failed in their duty to notify the plan administrator of a qualifying event under

27 | 29 U.S.C. 1163, namely the sale/closure of the facilities resulting in the termination of

28 |

**CLASS ACTION/REPRESENTATIVE COMPLAINT**

1 | the employees' employment, and/or that the health insurance plan was being retroactive
2 | terminated.

3 | 111. No notice was therefore sent by the administrator to any of the affected
4 | employees and they were left without coverage, or an opportunity to secure replacement
5 | coverage.

6 | 112. It is further alleged that the Bridge defendants and the Tutera defendants
7 | that are not administrators acted in concert and in conspiracy with the defendants that
8 | qualify as plan administrators to commit the violations alleged herein, and or that they
9 | knowingly participated in activities that they knew would result in the damages alleged
10 | herein.

11 | 113. It is alleged based on these facts that the defendants are liable to plaintiffs
12 | and each member of the class in the amount of $110 per day since the violations
13 | occurred (29 C.F.R. § 575.502c-1) and, additionally, all medical costs incurred by
14 | eligible beneficiaries that would have been covered by COBRA benefits, but were not
15 | because of the defendants' failure as an employer or administrator to notify the
16 | beneficiary, pursuant to the "other such other relief" clause of 29 U.S.C. § 1132(c)(1).
17 | Such relief is especially warranted here because of the egregious conduct of the
18 | defendants as specified hereinabove.

19 |
20 | **SEVENTH CLAIM FOR RELIEF**
21 | (VIOLATION OF THE WORKER ADJUSTMENT RETRAINING AND
22 | NOTIFICATION ACT ("WARN"))
23 | *By Plaintiffs Against All Of The Defendants*

24 | 114. Paragraphs 1 through 80 are re-alleged and incorporated herein by this
25 | reference.

26 | 115. For purposes of WARN "the term 'employer' means any business
27 | enterprise that employs ... 100 or more employees." 29 U.S.C. § 2101(a).

28 |

116.   At the time of the sales of the individual assets of pleasant care, which resulted in the mass layoffs, each of the defendants was responsible for operating the business as a going concern and their role was not simply to liquidate the business. Each took a role in the continuing operation of the business and exercised control over the affairs of the business.  Further, defendants were aware long before the sales that the sales were going to occur and provided no 60 day WARN notice to the employees. Even where the employees continued employment with the purchasing entity, they lost significant benefits (such as their health insurance) which mandated WARN notice.

117.   Plaintiffs are presently unaware of the number of members of the WARN subclass, but allege that they number in the hundreds and is certainly more than 100.

118.   The actions specified herein were taken with conscious disregard of the plaintiffs' rights and were oppressive and malicious.

119.   As a direct result of the defendants' violations of WARN, plaintiffs and the members of the WARN subclass are entitled to back pay and other remedies as specified in the Act (29 U.S.C. Section 2104).

### EIGHTH CLAIM FOR RELIEF

(VIOLATION OF CALIFORNIA *LABOR CODE* SECTION 1400 ET SEQ.)

*By Plaintiffs Against All Of The Defendants*

120.   Paragraphs 1 through 80 and 117-119 are re-alleged and incorporated herein by this reference.

121.   As a direct result of the defendants' violations of California *Labor Code* Section 1400, et seq., plaintiffs and the members of the WARN subclass are entitled to back pay and other remedies as specified in California *Labor Code* Section 1402.

///

///

///

1

## NINTH CLAIM FOR RELIEF

2

(VIOLATION OF CALIFORNIA *LABOR CODE* SECTION 201 ET SEQ.)

3

*By Plaintiffs Against All Of The Defendants*

4   122.   Paragraphs 1 through 80 are re-alleged and incorporated herein by this

5   reference.

6   123.   At all times relevant hereto, the members of the defined class were entitled,

7   on information and belief to payment for vacation time and/or unused sick time which

8   was not paid to them by Pleasant Care and the Pleasant Care family of Companies.

9   124.   It is further alleged that Bridge and the Tutera defendants were fully aware

10   of the obligations owed by Pleasant Care and the Pleasant Care family of companies

11   and that Bridge interfered (with the full and knowing participation of the Tutera

12   defendants) in assuring that those contractual obligations were not paid because this

13   would leave more money available to pay Bridge back its funds.   It is further alleged

14   that the decision not to pay these accrued wages was part of the same decision-making

15   process that resulted in the non-payment of health claims and the retroactive

16   termination of the health care program.

17   125.   As a direct result of the defendants' violations of California *Labor Code*

18   Section 201, et seq., plaintiffs and the members of the wage sub-class are entitled to

19   back pay and other remedies as specified in the California *Labor Code*, including

20   attorneys' fees.

21   126.   Further, plaintiffs are entitled to punitive damages because the defendants'

22   conduct was willful oppressive and malicious, all as hereinbefore alleged.

23

24

## TENTH CAUSE OF ACTION

25

(INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS)

26

*By Plaintiffs Against All Of The Defendants Except Mr. Bernabe*

27   127.   Paragraphs 1 through 80 and 93-100 are re-alleged and incorporated herein

28   by this reference.

128. The conduct by the Tutera and Bridge defendants was outrageous and was committed with the intention to cause the plaintiffs and the members of the class severe emotional distress or with reckless disregard of probability of causing them extreme emotional distress.

129. Plaintiffs and the members of the class all in fact suffered severe or extreme emotional distress damages and that distress and damage was caused by the Tutera defendants' conduct.

130. The conduct alleged was undertaken with malice, oppression and in a manner sufficient to shock the conscience so that punitive damages are appropriate.

## ELEVENTH CAUSE OF ACTION

### (INTENTIONAL INTERFERENCE WITH CONTRACT)

*By Plaintiffs Against The Bridge Defendants*

131. Paragraphs 1 through 80 and 93-100 are re-alleged and incorporated herein by this reference.

132. As alleged above, there existed a valid employment contract between the members of the defined class and Pleasant Care and the Pleasant Care family of companies. The Bridge defendants had knowledge of this contract and committed intentional acts designed to induce a breach or disruption of the contractual relationship by Pleasant Care and the Pleasant Care family of companies as alleged herein.

133. There was in fact an actual breach or disruption of the contractual relationship consisting of both the non-payment of wages and also the non-payment of health claims and retroactive termination of the health benefits program and the members of the defined class have suffered damages as a proximate result thereof.

134. The conduct by the Bridge defendants as alleged herein was deliberately intended to, and did, interfere with the employment contracts of the members of the defined class; it was outrageous and was committed with the intention to cause the plaintiffs and the members of the class injury, or was committed with such reckless

1  disregard of probability of causing them damage as to warrant the imposition of

2  punitive damages.

3

4                    **DEMAND FOR JURY TRIAL**

5          Plaintiffs hereby request a trial by jury on all of their legal claims and request an

6  advisory jury as to all claims for which they have no right of jury trial.

7

8                    **PRAYER FOR RELIEF**

9          WHEREFORE, Plaintiffs pray for the following relief:

10         1.     That the Court certify the action as an appropriate class action, and appoint

11 Plaintiffs as adequate representatives and Plaintiffs' attorneys as counsel for the class;

12 **ON THEIR FIRST, SECOND AND SIXTH CAUSES OF ACTION:**

13         1.     That the Court declare that defendants violated their obligations under the

14                ERISA health care benefit program, or assisted in such violations, pursuant

15                to which class members are entitled to receive payment for their medical

16                expenses and all other benefits under the health care benefit program in

17                addition to the medical expenses incurred by the COBRA subclass due to

18                the failure to provide the plaintiffs and the COBRA subclass with the

19                opportunity to obtain replacement coverage.

20         2.     That the Court, pursuant to its equitable jurisdiction enter such other orders

21                as are necessary to cure the egregious violations of ERISA by the

22                defendants.

23         3.     That the Court award the Plaintiffs and Plaintiffs' attorneys their attorneys'

24                fees, costs, and any other relief the Court deems appropriate.

25 **ON THEIR THIRD CAUSES OF ACTION:**

26         1.     For a determination that none of the defendants can assert that any state

27                law claims are preempted that arose after the June 30, 2007 retroactive

28                termination date of the health care benefit program.

1  **ON THEIR FOURTH, FIFTH, NINTH AND TENTH CAUSES OF ACTION:**

2      1.    For actual damages according to proof.

3      2.    For punitive damages.

4      3.    For costs of suit incurred.

5      4.    For such other relief as the Court deems appropriate.

6  **ON THEIR SEVENTH CAUSE OF ACTION:**

7      1.    For actual damages and penalties as specified in 29 U.S.C. Section 2104.

8      2.    That the Court award the Plaintiffs and Plaintiffs' attorneys their attorneys'

9      fees, costs, and any other relief the Court deems appropriate.

10     3.    For such other relief as the Court deems appropriate.

11 **ON THEIR EIGHTH CAUSE OF ACTION:**

12     1.    For actual damages and penalties as specified in California *Labor Code*

13     Section 1402.

14     2.    That the Court award the Plaintiffs and Plaintiffs' attorneys their attorneys'

15     fees, costs, and any other relief the Court deems appropriate.

16     3.    For such other relief as the Court deems appropriate.

17

18 Dated:  January 16, 2008

19

20

21 By: _____

22     David J. Vendler, Esq.
    MORRIS POLICH & PURDY LLP

23     Richard T. Baum, Esq.
    LAW OFFICES OF RICHARD T. BAUM

24

25     Attorneys for Plaintiffs
    FILEMON CONSOLACION, MARTHA

26     PLEITEZ, GRACIELA RUBALCABA, DIANA
    JAPENGA and CARMEN PRESTON-FOO,

27     individually, and on behalf of the classes of
    similarly situated persons, and the general public

28

**CLASS ACTION/REPRESENTATIVE COMPLAINT**

# Exhibit "A"

## AN INTRODUCTION TO

# TUTERA HEALTH CARE SERVICES

Tutera Group, by and through various affiliates and subsidiaries (Tutera), is a nationally recognized health care management and restructuring company. Currently Tutera owns, operates, or manages in excess of 40 skilled nursing, assisted living, or retirement facilities in 10 states and has operated as many as 90+ facilities at any given time over the past several years. Tutera is one of the largest privately owned health care management companies in the United States.

Tutera started its health care business with the development of skilled nursing centers located on the campuses of large metropolitan hospitals in the Kansas City area. Through Tutera's success with managing these projects, Tutera was able to expand its owned and managed portfolio. Tutera's success in the third party management of both for profit and not for profit facilities has earned Tutera a national reputation for being a turnaround expert for troubled long term/senior care facilities, as well as an operational enhancement expert for more stable operations. The implementation of management systems, techniques, policies, and procedures developed through the operation of its own facilities has proven to be very successful in the start up of new facilities, as well as rebuilding the systems for existing facilities.

The Tutera Group continues to grow through the development of senior care facilities, management services, and acquisition.

Success stories are common for Tutera. For example, Tutera assisted a single, community-owned facility by securing a new lender to re-issue its bonds that were in default, increasing census from 60% to 95%, and restoring community trust in just under twenty-four months. In the early 1990's, Tutera took over the management of the then largest non-profit nursing home operator to file bankruptcy. During the first year after reorganization, Tutera was able to more than double the company's income, increase their operating efficiency thereby exceeding the budget plan by 40%.

Each project we undertake is treated as if it were our own investment. Our owned and managed facilities know that we place their interests first and that they can count on us for increased performance and competitiveness at every level of their operations. Each strategic plan developed by Tutera for a client is customized to meet and exceed the client's needs and expectations.

Our principles of management are the result of over 75 years of combined experience in the long-term care industry. It is because these principles are rooted in the successful development and operation of our own projects that we quickly earn and maintain the trust and confidence of the clients we serve, which include skilled nursing (long-term care), senior housing, and retirement centers located throughout the United States.

## Management Structure of the Organization

Tutera divides the facilities regionally. Each region has its Regional Director, Corporate Nurse, and Field Financial Analyst. These groups work together as a team providing optimum communication between these disciplines. This regional staff is supported and directed by the corporate office staff located in Kansas City, Missouri specific to discipline as well as Human Resources, Risk Management, Accounting, and other areas of specific knowledge and expertise. Financial statement production, data processing, reimbursement, budgeting, planning, and human resources functions are centralized.

- **Biographies of Key Staff**

The Tutera staff is specially trained in managing long-term care and senior housing facilities. Selected biographical information on certain of Tutera's (all of which are intimately involved in the management of each Facility) key personnel is set forth below:

*Joseph C. Tutera, President and Chief Executive Officer.* Graduate of Boston College with degrees in marketing, finance, and computer science. Mr. Tutera has broad experience in the development, construction, financing, and operation of health care facilities as well as commercial real estate. Mr. Tutera's finance background and experience in a wide range of debt and equity structures provide valuable insight into available restructuring alternatives to many of Tutera Health Care Services' clients and provide the ability to quickly evaluate a facility's financial capacity. Mr. Tutera has successfully structured many reorganization plans for financially troubled health care facilities. Mr. Tutera's specialized forecasting, financial analysis, and budgeting systems, which are specifically geared to the health care industry, are utilized exclusively by Tutera managed facilities to efficiently and expediently review and control the financial conditions at those facilities.

*Scott E. Gulledge, Chief Operating Officer.* Graduate of Western Illinois University with a degree in Health Administration. Mr. Gulledge is responsible for the day to day operations of the health care division, including oversight of all Regional Directors, Nurse Consultants, and Dietary Consultants, all working under him in this division. Mr. Gulledge is a seasoned health care professional with several years of experience in multi-facility operations. Mr. Gulledge has handled all aspects of the health care industry specializing in maximizing profit through expansion of services and maximizing reimbursement.

*J. Clark Ribordy, Chief Financial Officer.* Graduate of Illinois State University, Magna cum Laude, with a degree in accounting. Mr. Ribordy is a Certified Public Accountant who previously served as an audit manager for an international accounting firm and as a Vice President of Finance and Controller for another national long term care management

and consulting firm. Mr. Ribordy has 16 years of long term care experience. Mr. Ribordy is a published author and has made numerous presentations at various seminars, including the National Investors Conference.

*Dr. Randy Bloom, Senior Vice President of Facility Operations.* Graduate of the University of Kansas with a BA in psychology, California School of Professional Psychology with a Master's and PhD in clinical psychology. Dr. Bloom has 20 years of long term care experience. Dr. Bloom assists Mr. Gulledge in all aspects of the day to day operations of the health care division, including oversight of all Regional Directors. In addition, Dr. Bloom has authored the model for the provision of Alzheimer's care within the company. His published works include training manuals on the assessment of geriatric residents in long term care and management of behavior issues for residents in long term care.

*Teri Taggart-Sankey, Senior Vice President of Business Office Services.* Ms. Taggart-Sankey has 20 years of long term care experience in all facets of administration. She served on the Administration and Finance Committee of the Illinois Health Care Association and previously served as a Director of Business Office Services for a multi-facility group in Northern Illinois. She also worked as a consultant for a national accounting firm in reimbursement and collection issues. Ms. Taggart-Sankey directly supervises the Field Financial Analysts for Tutera Health Care Services and is responsible for their training and efficiency in the field. She is involved in the training for Admission Coordinators in all areas related to Accounts Receivable and Collection.

*Teresa Bianchi, RN, BSN, CWCN, CCCN, Vice President of Clinical Services.* Graduate of Southern Illinois University @ Edwardsville with a BSN. In addition, Ms. Foster is a WOCN (Wound Ostomy and Continence Nurse) having received this education from the Harrisburg Area Wound Ostomy and Continence Educational Program and holding national certifications in Wound Care and Continence Care through the WOCNCB. Ms. Foster has a long history in the Long Term Care Industry, dealing with all aspects of direct care and management. She is responsible for the Clinical Services of company, including direct oversight of the Regional Nurses as well as Clinical Policy and Procedure development and implementation.

*Michael S. Levitt, Vice President of Acquisition and Development.* Mr. Levitt is a seasoned Administrator with multiple new start up experiences and is well versed in Medicare and Medicaid reimbursement for several states. He oversees the preparation and implementation of all capital improvement budgets and directly supervises the general contractor on all major construction projects. Mr. Levitt also serves as the Corporate Compliance Officer under the Corporate Compliance plans adopted by Tutera and its various clients. Mr. Levitt has been with Tutera since 1985 and has been active in the long term care field for over 20 years. Mr. Levitt is a past President of the Missouri Health Care Association.

*Ilene Shapiro, Vice President of Accounting Information Services.* Ilene Shapiro has been with the Tutera Group since 1984. Ms. Shapiro has set up computer systems and has designed, developed, and implemented accounting systems for both Corporate and facility-specific operations. She is also well versed in Medicare and Medicaid reimbursement.

*Ron Cork, Vice President of Human Resources.* Graduate of Chadwick University with a degree in business administration and National-Louis University with a Master's in HR Management and Development. Mr. Cork is responsible for Tutera's entire human resources department, which assists Tutera's clients with personnel matters ranging from evaluation, design, and implementation of wage and salary benefit programs to recruitment and retention programs to labor negotiations and compliance issues such as COBRA and ADA. Mr. Cork was formerly an Associate Professor at Southern Illinois University and is a member of the adjunct faculty at Webster University in Kansas City, Missouri.

*Angie McCall, Vice President of Marketing.* Mrs. McCall has worked in Long Term Care Marketing/Admissions for 17 years and joined the Tutera Group in 1999. She has served at all levels of nursing home admissions and marketing. Prior to this time, she was the marketing director for Fellows Enterprises, a nursing facility chain owned and operated in Louisiana. She first worked with the Tutera Group as a Regional Marketing Director and now oversees the admissions and marketing systems for all Tutera facilities. Angie has been instrumental in developing and implementing the Tutera marketing and admissions system in its current form.

### Marketing

**The Tutera Marketing System** combines state of the art marketing approaches with a solid understanding of the unique nature of the long-term care market and the key decision-makers that drive the admission process. The program is designed to develop a solid foundation on which long-term census growth may be built. Our system can be explained within four interrelated processes.

1. **Continuous Improvement**. The key to quality in any system is that it be continuously improving. The Tutera Marketing System has been designed so that continuous feedback can be evaluated with respect to our systems and processes. A standardized evaluation tool, completed by our regional staff, assures that each of our facilities consistently work toward our stated goals.

2. **Measurement.** The Tutera Marketing System has been designed to collect both key process measurements (i.e., Competitor Analyses, SWOT Analyses, Inquiry Tracking System, Primary and Secondary Referral Sources, Conversion Ratios, Marketing Visits, etc.) and key outcomes measures (Inquiries, Admissions, Discharges, Customer Satisfaction). As results from these measures are obtained, our staff is able to quickly identify market trends and make appropriate changes to meet the needs of an ever-changing healthcare environment. More importantly, the results obtained through these measures allow us to build custom marketing



plans for each facility. This ability to make operational changes, consistent with market variables, help us build a solid and growing census in our facilities.

3.    **Training.** The Tutera Marketing System includes training for all facility personnel associated with the admission process. The training provided by our senior staff is not only limited to the specifics of our marketing program. Our training program also focuses on providing our staff with the tools necessary to make quality sales calls within the community, as well as training on proper technique for selling the customer once in the facility.

4.    **Team Approach.** The Tutera Marketing System recognizes that census development requires a team approach. The facility must be clean and ready to show, residents and families must be satisfied, employees must be motivated and satisfied, and the care must be excellent. That is why we form a facility based cross-functional marketing team and charge this team and its members with implementing and helping continuously improve the marketing plan. In facilities managed by Tutera, census development is everyone's job.

In sum, The Tutera Marketing System is designed to build census within a continuously improving system, while stressing comprehensive knowledge of the applicable health care market, and shared responsibility of all staff for overall program success.

### Systems

Galaxy Hosted Software, LLC (Galaxy) provides:
- MDS/Care Plan
- Resident billing and account receivable

The Galaxy product is web-based software developed by Galaxy Hosted Software, LLC, in Cleveland, Ohio. Galaxy is hosted by a nationally recognized hosting facility in Chicago, Illinois. Each facility is able to access the software via a license issued to each facility under a Tutera master license agreement. The programs are accessed locally at the facility on Microsoft Windows 2000 or higher, operating system. This system, and its predecessor, have been used for over 15 years by Tutera trained staff. While this software is proprietary, the web-based produce currently in use was beta tested by the management company's clients. The management company personnel were very involved in the design and features of the current system based on its knowledge of the predecessor version and the industry as a whole. Tutera contracts for the support with dedicated personnel that handle only its clients on an as-needed basis.

### Human Resources

Wage programs are based on the client's ability to pay and the competition's wages. We have been using with moderate success "union scale" wage programs for the nursing department. Base wage rates are generally set at the top of the market, and employees receive 2% wage increases every 3 months during the first year. This type of scale promotes retention and a unique advertising tool for marketing new staff.

Due to the significant competition in the labor market, our nursing homes have been forced to go beyond newspaper advertising to market staff. Our recruitment programs are based on: 1) identifying individuals in our target labor market using a variety of techniques; 2) market those individuals identified on a continuous basis using telemarketing and direct mail mediums -- in addition to newspaper advertising; 3) establishing strict procedures on handling initial employment inquiries; improving application and interviewing process; and 4) immediately offering applicants a position and quick start date contingent upon reference checks, etc. We have hired medical recruiters in buildings that have a history of staffing problems to significantly increase marketing and application processing efforts. These programs have reduced employee turnover by more than 100 percent in certain markets.

Every new employee goes through two types of orientation. GENERAL orientation is conducted on the first day of employment and covers the completion of employment paperwork, reviews key personnel policies and work rules, and benefits. PROFESSIONAL orientation is conducted immediately after the general orientation where the new employee is sent to their work unit for approximately 3 days of training specific to their position. "Buddy System" is typically used in this process. Ongoing inservice training is conducted at least monthly to comply with state regulations and address key issues within the facility. Administrators, DON's, and Department Heads receive regular training during regional meetings and visits by Corporate Consultants.

Benefit programs are based on market conditions, client's desires, and benefit programs in place at the time we enter into the management contract. We normally install Section 125 programs so both the employee and the client can enjoy the tax savings and provide ongoing benefits administration to assist in compliance to state and federal regulations.

System-wide, Tutera will provide Human Resources services to approximately 5,000 employees. Tutera strives on implementing programs that reduce turnover, increase employee satisfaction, and create a safe work place. The integration of multiple disciplines to achieve these objectives is key to our success in this arena.

### Accounting Procedures

It is Tutera's philosophy that the accounting function be separated from the operations or administration of the facility. The accounting function is designed to gather information of the facility's day to day operations. This information, when routed through the appropriate channels, provides the data required for the accurate production of financial statements. Through the processing of this information, vital operating statistics are then relayed back to the facility and its regional staff for accountability to various operating performance benchmarks.

The Accounts Payable function is accomplished through batching from the facility to the Tutera Home Office in Kansas City on a weekly basis. The purchasing and approval of invoices originates in the facility where the services are incurred and/or services have been provided. Approval and coding of the invoices is accomplished at the field level and signed off by the Facility Administrator before transmitting to Kansas City. Kansas City verifies for appropriate

documentation before processing the invoices and performs certain control tasks. Cash management function is then completed at the Kansas City office.

Cash disbursements are processed through Kansas City. Disbursements are countersigned by one officer of Tutera, and then returned to the facility for a counter signature by the facility Administrator. This counter signature provides for a second verification of the appropriateness of the payment of the services or supplies purchased.

The payroll function is handled in a similar manner with a transmittal being sent from the Kansas City office to the Field for completion and then returned back to the Kansas City office for processing. Daily labor reports are available via the management company proprietary management center website. This report isolates variances budget each day in terms of hours worked by discipline. Also, with the completion of each payroll, a payroll budget report is prepared. The payroll reports are then distributed via the website to the Administrator and Regional Director.

The Accounts Receivable function is maintained at the facility level with its access to the web based Accounts Receivable system. This system is monitored at both the facility and corporate levels to assure accuracy of revenue generation and billings.

The Field Analysts and the Senior Accounting staff at the Corporate Office are provided with monthly trend reports on the facility's Accounts Receivable balances by payor source so that any problem areas can be quickly identified and addressed.

### Cost Control Programs

Tutera has established national contracts for the purchasing of supplies and services in the areas of Medical Supplies, Therapy Services, Pharmacy Services, Chemicals, Linens, Raw Food, Insurance, and other items. The main aspect that distinguishes Tutera's purchasing contracts from those of other national purchasing contracts is that emphasis is not only centered around quality products and good prices but also control and containment of utilization.

On discretionary purchases, such as chemicals, where the volume of supplies purchased can vary considerably from facility to facility, a per patient day cost has been negotiated. This method assures the facility Administrator and the management that appropriate levels of supplies are being maintained at the facility, and that the supplies are used economically. At the same time, we are assured that quality products are provided.

Systems are also set up to monitor reimbursable expenses to assure accurate and complete billings. To work with the vendors not only on pricing but also the implementation and utilization of their services is an integral component in the success of Tutera's cost minimization program.

In order to reduce workers' compensation cost, we look to enroll the facility into a Tutera workers' compensation pool with a strong loss control program. The main advantage to the

7

participation in the pool is an elimination of any excess charge assessed by the State and the ability of Tutera staff to directly interact with the resolution of claims. Workers' compensation loss reports are provided monthly by our claims servicing company, which are then made available to the facilities to review accuracy of reserves as well as identification of the type and volume of claims that the facility is experiencing. Management is able to work with the claims servicer on the handling and payment of claims. Safety Committees are established at the facility, and the facility's experience is reviewed by its Regional Director on a monthly basis. Other programs, such as back restraint devices to control back related injuries as well as "return to work" policies, are reviewed on a per facility basis.

### Development & Implementation of Specialty Programs

Tutera, through its growth of third-party management contracts, typically runs across projects which have met tough financial times. Often associated with the financial troubles are reputation problems, as well as over bedded markets. In an effort to address these issues, Tutera tries to expand the facility's current market base. This is often done through the establishment of specialty programs. These programs include Alzheimer's Units, Ventilator, Skin Care, Head Injury, as well as other programs. The approach to development of specialty programs is established on a per facility basis. Depending on the needs of the community as well as various attributes ranging from human resources to the physical plant of a particular facility, a specialty program is identified. The market is tested and the program is implemented. Many of the programs require physical plant alteration. Tutera, with its background in real estate development, is familiar with this process.

### Experience in Sub-Acute or Intensive Skilled Nursing Programs

Tutera had its beginning in the development of nursing homes based on hospital campuses. As a result, Tutera has been heavily involved in rehabilitation services, integration with LTAC's, and specialty care units; e.g., ventilator units. These units have proven to be extremely profitable as well as provide a source for the project's census development.

### Budget Development Process

Tutera distinguishes itself from other management companies by its interactive budgeting systems. The budget system is broken down into five categories: Revenues, Labor, Discretionary Purchases, Non-Discretionary Purchases, and Ancillary Expenses.

Revenue is developed based on a projection of census by payor source and daily room and board per patient day rates. Ancillary expenses are based on per patient day revenues by payor source and an application of the appropriate contractual allowance.

The Labor component is developed from the facility's actual staffing patterns and tied back to the facility's schedule. This system is laid out to be consistent with the facility's 14-day payroll cycle. A grid is established for each payroll department, identifying the number of hours associated with various census levels. The hours are associated with the weighted average cost

per hour for employees within this department. This weighted average cost per hour is then increased according to approved pay scale increases for each of the departments. This creates the basis for an interactive expense control system for labor, which constitutes approximately 70% of the facility's overall expenses.

Depending on current census levels as well as the current fiscal period, the facility's budget reports are prepared against current payrolls identifying variances by department in both hours worked and cost per hour. The report also includes identification of the ratio of allocation of hours between the Distinct and Non-Distinct Units, as well as any agency or miscellaneous pay which may have been incurred during the payroll period. This same system follows over to the facility's budgeted financial statement identifying the appropriate wages for a given fiscal period based on the census which was actually achieved and contrasts this with the actual wages incurred during this month.

Payroll related expenses; i.e., payroll taxes, workers' compensation, and benefits (vacation, holiday, and sick pay) are based on a percentage of actual wages projected per the labor grid.

Non-Discretionary expenses (i.e., real estate taxes, insurance, contract purchases, etc.) are identified and backed up against actual service contracts, leases, etc. These expenses are identified either on a monthly basis or as a per patient day cost factor.

Discretionary expenses (i.e., raw food, chemicals, repairs, maintenance, etc.) are based on the facility's historical performance, fixed expenses as tied to national purchase contracts, and experience based on other facilities in the same market area of similar size and physical plant. These expenses are also identified either on a monthly amount or a per patient day factor.

Ancillary expenses are projected from anticipated ancillary revenues. Again, this budget expense is interactive in that the current month budget is calculated based from actual ancillary revenues incurred. This is calculated by identifying the various cost to charge ratios associated with each type of ancillary service. Given our experience and high utilization of Medicare Part A and Part B, without proper adjustment of the budget to reflect large swings in ancillary services, it is very difficult to identify the facility's bottom line performance versus the budget.

By putting these systems in place, the facility administration and the management are allowed to concentrate on labor first on a daily and by-payroll basis, identifying 70% of the facility's expenses and 90% of the facility's discretionary expense categories. The Administrator and staff can then focus on a relatively small number of purchases which they can control to assure that they are maintained within their budget allotment.

Daily, weekly, and monthly operating and management reports are available and are utilized to compare actual performance results to projected and budgeted results.

<u>**Recruiting Sufficient Qualified Staff Members**</u>

9

Given the large number of facilities Tutera operates, a large network of personnel and resources from which to draw attracts qualified Department Managers for a given facility. Wage surveys are conducted on the competing facilities to determine what benefits and wages are being offered. A benefit package is put together specific to a facility that meets the market to eliminate those barriers in the employment process.

### Developing & Delivering Employee Training In-service Programs

Tutera has a series of educational programs available to its employees. These training and in-service programs are detailed in the various manuals specific to each department. These training programs are held on an as needed basis depending on the number of new employees hired for the facility.

### Corporate Compliance

The prosecution of fraud and abuse within healthcare has become the federal government's number one priority, with violent crime as its number two priority. Nursing home investigations by the Officer of Inspector General (OIG) doubled in 1999.

Back in the fall of 1998, Tutera recognized the need for an effective Corporate Compliance Plan. We undertook steps to develop, draft, and implement a Corporate Compliance Program.

First and foremost, an effective Corporate Compliance Program simply makes good sense. It provides the framework for review and evaluation of the current procedures and policies of the organization, training and education for personnel, and ongoing monitoring and review of the business practices of the organization. Such review, evaluation, education, training, and general promotion of good business ethics and practices within the organization has become increasingly important, particularly in the health care context, in light of recent emphasis on enforcement of fraud and other compliance issues. The importance of an effective Compliance Program has been further emphasized by the promulgated Federal Sentencing Guidelines, which allow for reduction in sentences if the organization has in effect a program to prevent and detect legal violations.

Also of importance is a general understanding of what a Corporate Compliance Program is and what it is not. A Corporate Compliance Program is not a person, a committee, a plan, policy, or a document but, rather, it is all of these. A Corporate Compliance Plan, if it is to be effective, cannot be purchased "off the shelf" and placed back on the shelf with a rubber stamp of the Board of Directors. An effective and valuable Corporate Compliance Plan is an ongoing process, which becomes a part of the very fabric of the organization, and monitors and influences the behavior of individuals and the organization.

Exhibit A, Page 44

A Corporate Compliance Program must begin and end with the organization's Board of Directors. The Corporate Compliance Program will be based on an organization-wide Code Of Conduct and will guide and affect the operations of the organization as a whole. Such a program can necessarily arise only from action of the Board of Directors. Thus, the initial step in a Corporate Compliance Program should be a Resolution of the Board of Directors stating the purpose and authorizing the development of the Program.

It is also important at the early stages of corporate compliance planning to formally engage legal counsel. The Compliance Program will necessarily involve auditing and/or investigation of potentially sensitive issues. By engaging legal counsel to perform, or work closely with in-house counsel in the performance of certain audits or investigations, or by having legal counsel engage other outside experts to perform such audits or investigations, the organization can enhance the potential that the confidentiality of such audits or investigations will be maintained under the attorney-client privilege. As indicated above, a thorough discussion of the attorney-client privilege in the context of corporate compliance has been included in these materials as well.

The next crucial step in the Corporate Compliance Program is the appointment of a Corporate Compliance Officer. This individual will be responsible for coordinating and implementing the Corporate Compliance Program. They must be of sufficient stature in the organization, and sufficiently assertive, to challenge assumed compliance and to command the attention of management. In addition, the individual must be accessible to and approachable by employees to facilitate reporting and cooperation with investigations.

Creation and implementation of a Corporate Compliance Program will also require the input and assistance of a Corporate Compliance Committee. Such a Committee should be comprised of representatives of essential operational areas of the organization. For example, areas of representation might include billing, finance, physician relations, marketing, human resources, and management of related services; such as, laboratory, durable medical equipment and hospice.

Key areas in which the Corporate Compliance Committee will be of assistance include the creation of the Corporate Compliance Plan and the initial risk assessment. The Committee will evaluate or perform a risk assessment of the organization to identify significant areas of concern and prioritize the development and implementation of the Plan to focus on the organization's most high-risk areas. A Compliance Plan Risk Assessment was developed with the assistance on outside expert. Once the Plan document is completed, the Corporate Compliance Committee may be utilized for various future responsibilities with respect to oversight of the Program.

The completed Cooperate Compliance Plan document should be submitted to the Board of Directors for its review and approval. Once the Plan document is approved by the Board, the Corporate Compliance Officer can begin the process of implementing the Plan, including the development of department, or area-specific Standards of Conduct, development of training and education materials, implementation of educational processes for all employees, and continuing

review or audit of compliance and adjustment or modification of the Plan to address new regulatory issues or identified compliance problems.

Tutera spent three months in the development, which culminated in the rollout of the Corporate Compliance Plan, which incorporated the seven steps to compliance. Those are:

1.    Establish a reasonable code of ethics and lawful behavior for employees that address the high-risk for potential fraud or abuse. Write it up in clear, legible style and post it in a prominent place.

2.    Designate a high-level officer to oversee the compliance function.

3.    Confirm appropriate license and credentials and perform criminal background check when hiring staff.

4.    Educate and train all employees to assure their competence and full knowledge of the rules and regulations.

5.    Establish regularly scheduled compliance audits and reviews to prevent patterns of errors and to uncover improper conduct. Set up a reporting system, such as a telephone hotline, for employees who have concerns.

6.    Enforce standards through well-publicized guidelines that emphasize disciplinary consistency.

7.    Establish procedures to respond appropriately to any offense and to prevent similar occurrences. Modify compliance program as circumstances dictate.

Additional audit procedures and investigative tools are being designed to supplement the current process as recommended in the recently released OIG Model Compliance Plan for Nursing Homes.

Exhibit A, Page 46

## Frequently Asked Questions

**1.     Does the organization have any experience in turning around a troubled facility?**

Tutera has built its management structure around the personnel, systems, and methods required to handle the successful turnaround of troubled facilities. These methods have been refined over the years and implemented by Tutera staff with many years of hands-on experience predominately with chain operations. The methods and systems used in the transition of troubled facilities require expertise only gained through experience in successful conversions to professional third party management, as well as management tools developed out of the needs of troubled facilities that work with the limited resources that are typically available to facilities in transition.

**2.     What is the financial strength of Tutera?**

Tutera is a private company that in addition to its substantial holdings in senior housing maintains a large portfolio of retail and office properties in the Kansas City Metro area as well as a commercial bank. Bank references are available as Tutera maintains multiple lines of credit for the purpose of providing working capital to its managed clients and for its transaction business. The company is bondable, and its credit standards allow it to routinely meet any financial obligation associated with its services.

**3.     Are payables and receivables managed centrally or at the facility level?**

Receivables are processed locally and reviewed on site by management field personnel dedicated to the business office function. Payables and payroll are handled out of the management company's home office in Kansas City, Missouri. All invoices originate at the facility and are batch transmitted to the home office where they are reviewed, tested, and processed. Cash management and check processing occur at the home office where checks are signed by management and countersigned by the owner's representative initiating the purchase (typically the administrator). The system has been developed and refined for 15 years and provides multiple check points for accuracy and fraud prevention while creating an inherent accountability and ownership of expenses at the facility level where the expense and liability originate. Management and its personnel are all fully insured and bonded.

**4.     How does Tutera manage accounts payable?**

Tutera utilizes a series of reports all linked to a central data base of information that allows the management and accounting staff access to detailed, as well as summarized, information. Available via a proprietary web-site, all critical management reports are trended to provide historical summaries relative to bi-weekly payroll/staffing information, or monthly, relative to accounts receivables by payor source and profitability reports. Both balance sheet and income statement are trended up to 24 months. Key flash reports are designed to fit on one page including trend information providing management and facility personnel with timely reliable statistics on critical factors effecting the key performance of the facility.

13

Management's information system is state of the art utilizing specialized accounting software that is ODBC compliant allowing complex long term care specific reporting and budgeting. The information systems are designed to integrate with Tutera management methods, and virtually all management reports are available to authorized users via access to a proprietary web-site.

The management utilizes a fixed plan budget as well as an analytical budget model that looks forward each month and predicts the future month's performance based on current operating statistics and approved operating parameters. This proprietary Tutera system provides critical information and checkpoints for the industry's ever-changing environment and complex accounting issues.

5.    **Has Tutera or any company whose facilities Tutera manages defaulted on any indebtedness?**

Tutera has an unblemished record with its lenders and continues a strong relationship, even in the roughest of times, based on its conservative borrowing practices. Tutera does manage facilities that are in bankruptcy, or is hired to manage facilities in financial crisis as discussed above. Tutera is selective in the facilities that it will manage and makes a strong commitment to its clients to make every decision based on what is in the client's best interest.

6.    **Does Tutera have any joint venture agreements or contractual commitments that would otherwise conflict with their relationship with another party?**

Tutera believes that for it to best serve its third party management clients that it needs to remain independent from relationships that might inherently put it in conflict with the best interest of its clients; therefore, Tutera does not have any joint venture, off-balance sheet contingent liability, or other commitments in the health care management business.

7.    **What are Tutera's internal audit procedures?**

**Facility**

The internal audit function is carried out by Regional Field Financial Analysts (FFA) under the supervision of the Senior Vice President of Business Office Services. Each FFA has responsibility for approximately 8 - 10 facilities. These FFA's spend virtually all of their time at the facilities, with one day each week (on average) spent at their home office location for report preparation, paperwork, filing, etc.

In the facility Business Offices, the FFA's are responsible for the recording, reporting and collection monitoring of all facility revenues. The FFA spends considerable time with the Business Office personnel, as well as the Administrator and Director of Nurses, training and consulting on how the flow of information and documentation must work in order for all admissions to result in accurate and timely billing and collection.

Exhibit _A_, Page _48_

The FFA's are also responsible for monitoring and reporting issues with respect to the processing of payroll and accounts payable invoices. During the facility visits, the FFA will inspect the paid and unpaid invoice files, will review the personnel files, and will visit various department heads in their offices to discuss issues with them, as well as physically observe their respective areas.

Due to the fact that the FFA is trained in all Business Office functions, they are often called on to train and solve issues outside of the current Business Office personnel's experience or expertise.

Any inappropriate or improper activity or behavior that is observed or is deduced by the FFA (as well as all corporate personnel) during their site visit is communicated immediately to the corporate office, either through the Corporate Compliance Officer if so warranted, or to the appropriate Operational or Accounting personnel.

### Corporate Office

At the corporate or "home" office in Kansas City, effective internal control is obtained primarily through software controls, segregation of duties, and supervision and review.

### A.    Systems

The software systems in place at the facility level (i.e., Galaxy for Accounts Receivable and MDS) are state-of-the-art, long-term health care-specific applications that contain the required and expected level of system-generated controls.

At the corporate office, the accounting software package was developed, and continues to be supported and maintained, by an independent company. This software also contains those usual and customary software controls that you would expect in an accounting software package.

### B.    Segregation of Duties

In terms of safeguarding the assets of the respective long-term health care clients, the area with the largest concern is obviously cash (which, for this discussion, includes currency as well as checks).

### 1.    Cash Receipts

In terms of cash, the control environment is such that absent collusion by two or more parties it would be very difficult for cash to be misappropriated without it being detected in a timely manner.

Exhibit _A_, Page _49_

Virtually all cash receipts are at the facility level. The corporate office will have some isolated cash receipts.

At the facility level, cash is required to be deposited daily. All cash receipts are detailed out on an electronic deposit log at the facility as well as on the deposit ticket. The electronic deposit log is submitted to the corporate office daily. Monthly, the bank "receipts" are sent to the corporate office and are reconciled to the daily deposit record. Daily, the cash management department at the corporate office checks all bank balances to ensure all activity is accurately recorded on the deposit log. The individual in the Business Office that makes the deposit is not the same individual that acts as the Accounts Receivable Bookkeeper.

The facility Accounts Receivable Bookkeeper enters the cash receipts off the deposit log and supporting documentation into the Accounts Receivable system at the facility level.

The corporate office reviews the deposit logs daily or as needed in order to manage cash disbursements.

At month end, the cash receipts ledger from the Accounts Receivable software at the facility level is reconciled to both the daily cash worksheet maintained at the corporate office, as well as the bank statement, during the month end financial closing process. The Staff Accountant for that particular facility oversees these reconciliations at the corporate office. The Staff Accountants have no access to any cash at any level. All discrepancies identified during this reconciliation process are researched and resolved prior to the monthly financial close being considered final.

Monthly, a statement of charges and balances due are generated and submitted to those residents/resident representatives with "private pay" balances due (Private Pay residents, Medicaid and Medicare Co-Pays, etc.). These statements would act as a final check with the outside parties that any and all cash receipts at the facility level have been properly recorded.

## 2. **Cash Disbursements**

Operational type disbursements are initiated at the facility. As invoices are received, they are compared to the product or service received by the appropriate department head and either approved or not approved. Approved invoices are forwarded to the Business Office where they are coded for batching and processing by the corporate office. All invoices are forwarded to the Administrator for approval. No operational type disbursement is processed without the Administrator or senior person's approval.

16

The approved operational invoices are batched and submitted to the corporate office for data entry and payment. Check runs are processed every other week for each facility, with weekly "emergency" runs completed on an as needed basis. Invoices are selected for payment from the "Cash Requirements" Report generated by the Accounts Payable Department. This report is reviewed by the Accounts Payable Manager and the Cash Manager together to determine which invoices, and how much cash, is available for that particular check run.

Once determined, the checks for those invoices selected for payment are cut at the corporate office by the Accounts Payable Department. The checks are signed via a check-signing machine. The Accounts Payable Manager maintains the signature stamp under lock and key.

The checks require two signatures. Once the checks are cut and signed at the corporate level, they are sent, via overnight courier, to the facility for the Administrator to review and co-sign. Once the Administrator has reviewed and co-signed, the checks are sent on to the vendors.

The payroll disbursement process is very similar in that the facility initiates the payroll process by completion of an electronic time sheet that is reviewed and approved by the Administrator, and sent electronically to the corporate office for review and check generation. The check generation process is similar to the accounts payable check generation process. Once the payroll checks are generated, they are sent via overnight courier to the facility Administrator's attention for review, co-signing, and distribution.

The Administrator (or designee) must approve payroll changes into the payroll system. The paperwork authorizing these changes is initiated at the facility level, approved, and submitted to corporate for data entry. No payroll changes are made without the appropriate authorization.

Non-operational disbursements are initiated at the corporate office. These types of disbursements include the monthly debt service payment, insurance payments, rent payments, etc. These disbursements are initiated by the Controller or the Staff Accountant, and are approved by the President, Chief Financial Officer, Chief Operating Officer, or Director of Facility Operations. These disbursements will not be made without one or more of these approvals. Once approved, these disbursements follow the same procedure as the operational disbursements with the exception that they are not forwarded to the facility for co-signing or distribution. Both signatures are obtained at the corporate office level, and the checks are distributed from the corporate office to the appropriate party.

17

C.      **Supervision and Review**

The facility Business Office personnel are supervised by the facility Administrator as well as the Regional Field Financial Analyst.  The Accounts Receivable and Accounts Payable process is reviewed both at the facility level (by the Administrator by virtue of their approval on transactions, and by their FFA by virtue of their training and follow up), as well as at the corporate level (Staff Accountants by virtue of the financial closing and reconciliation process, Controller by virtue of the monthly review of the financial statements and the balance sheet reconciliations).

Monthly, all bank accounts are reconciled at the corporate office by the Staff Accountant for that facility.  These bank reconciliations are reviewed by the Controller for propriety each month.

Monthly, all balance sheet accounts are reconciled by the Staff Accountant for that facility.  These balance sheet reconciliations are reviewed monthly by the Controller and quarterly, or as needed, by the Chief Financial Officer.

Monthly, the financial reports are distributed to the appropriate corporate personnel as well as facility personnel for their review.

8.      **What are some of the things that Tutera does to improve the efficiency of operations at a facility?**

Each home is monitored and staffed individually based on its needs and the needs of the residents.  Certain changes are constantly underway to improve the efficiency of the operation, the recruitment of qualified staff, the maximization of reimbursement, and the improvement of census and payor mix.  Specific areas of management focus for facility efficiency include detailed labor cost control; staff recruitment programs; Medicaid/IOC rate adjustments; census enhancement; PPS and contract negotiations.

9.      **Who prepares the cost reports, financial statement audits and income tax returns?**

Financial auditors are selected by the owner, and management works with the selected auditor to complete required work papers, consolidating schedules, and other work product required to support the financial records produced by the management.

Tutera typically recommends a Medicaid and Medicare cost accountant to be retained to file the year-end cost report.  Management prepares all associated schedules.

The accounting systems are health care specific, therefore are designed to produce the information required for cost reporting.  The management company maintains a reimbursement department with a Reimbursement Manager with multiple years of experience in reimbursement issues, as well as an in-depth knowledge of PPS reimbursement.  This department reviews all

Exhibit _A_, Page _53_

cost reports, accumulates information for reporting, and handles audit requests and negotiated settlements.

**10.     How are facility staffing ratios established?**

Facility staffing is set facility-specific based on acuity of the residents per wing. This information is used to develop a position control sheet that is converted into a Per Patient Day (PPD) staffing pattern. The PPD staffing is monitored bi-weekly by management and daily by the facility.

Management takes into consideration many aspects in determining the final staffing patterns for a facility. These aspects include, but are not limited to, physical plant design, acuity, quality of the staff, historical staffing levels, regulatory issues and past compliance and market conditions.

The staffing budget process begins for all departments by completing a position control sheet, which outlines the staff and hours that will be worked for each shift by department. This is completed by the facility department heads and Administrator with the assistance of the facility's regional administrator and regional nurse. Lastly, they are then given to the Director of Facility Operations and the Director of Clinical Services for their final review and approval.

These procedures ensure that all pertinent departments are involved in their staffing patterns before the budget is completed and that there is a full understanding at the facility level of the premise used to develop the staffing patterns, which will be closely monitored and enforced.

**11.     Does Tutera currently have excess staff capacity at the moment?**

Management has expanded its staff to meet the needs of its clients given the industry demands. This required the addition of field staff and the reduction of the number of facilities handled by each field person. Extended training and home office support have been aggressively pursued. Tutera's pursuit of additional contracts has been selective and focused in the markets it currently serves.

**12.     Describe any clinical monitoring or improvement programs currently under way.**

Tutera utilizes a seasoned staff of in-house Nurse Consultants. These Nurse Consultants perform quality assurance surveys for each of the facilities. These surveys are designed to exceed those that would be encountered in a normal State or Federal survey. Deficiencies are identified in systems and procedures facility-wide as well as the particular care needs of an individual resident. Staff training programs are established in each of the facilities, and regularly scheduled Directors of Nursing meetings are held to review new issues relating to compliance and licensure. The in-house surveys also assure that proper charting, documentation, and programming are maintained on each resident to assure that the maximum reimbursement is achieved accordingly.

19

Tutera has developed and utilizes a Pre-Survey Quality Improvement Program (PQIP) for survey preparedness.

In addition to internal processes, Tutera also utilizes a third party customer satisfaction feedback process. Results are given to facility and regional staff for follow up as well as Tutera home office and risk management department.

**13.    Describe the ancillary services offered.**

Tutera provides a complete complement of negotiated group purchasing contracts for all the purchasing and services utilized by the facilities. The contracts are negotiated to provide the maximum efficiency to the homes by utilizing the group purchasing power of all of Tutera managed facilities. These contracts provide consistency of terms and services for its clients. Tutera requires that vendors that service its facilities adhere to certain contractual standards.

Tutera utilizes form contracts and a rider to protect the facilities from fraud and abuse and provide consistent quality at competitive prices.

20

Exhibit A Page 54

# TUTERA'S TURNAROUND MANAGEMENT LIST

Tutera Health Care Services, L.L.C. and its various affiliates (collectively, "Tutera"), have assisted numerous owners, indenture trustees, bondholders and lenders of health care facilities by consulting, managing, providing working capital financing and acquiring health care facilities which may have defaulted on their obligations to creditors or filed a chapter 11 bankruptcy proceeding. Tutera has also developed, owned, leased and operated numerous skilled care and assisted living facilities over the past 19 years. Currently Tutera owns, operates or manages in excess of 40 skilled nursing and assisted living facilities in 11 states and has operated as many as 90+ facilities at any given time over the past several years. Below is a list of various matters involving health care facilities which have defaulted on their respective debt obligations or filed a chapter 11 proceeding in which Tutera has headed up an effort to maximize the return to bondholders, creditors and the owner.

### In re: First Humanics Corporation
United States Bankruptcy Court for the Western
District of Missouri, Western Division,
Case No. 89-42041-11

First Humanics Corporation was one of the largest not-for-profit long-term care providers to ever file a chapter 11 bankruptcy proceeding. This case involved twenty-one (21) nursing homes that were acquired through the issuance of approximately $83,000,000 in I.R.C. § 501(c)(3) tax-exempt bonds. Tutera worked closely with debtor's counsel to develop and confirm a plan of reorganization which involved obtaining a $5,000,000 super-priority priming loan for use as post-confirmation working capital and numerous modifications to the existing bond documents to maximize the return to bondholders. A list of the nursing homes and its respective tax-exempt bond issue is set forth below.

**Bartmann Health Care Center -** $2,500,000 First Mortgage Health Facility Revenue Bonds (First Humanics Corporation - Atlanta, Illinois Project) Series 1986;

**Crystal Pines Nursing Home -** $3,750,000 First Mortgage Revenue Bonds (First Humanics Corporation - Crystal Lake, Illinois Project) Series 1984;

**El Paso Health Care Center -** $3,250,000 Tax Exempt First Mortgage Health Facility Revenue Bonds (First Humanics Corporation Project) Series 1986 and the $350,000 Taxable First Mortgage Health Facility Bonds (City of El Paso, Illinois Project) Series 1986;

**Fair Oaks Nursing Center -** $2,050,000 First Mortgage Revenue Bonds (First Humanics Corporation - South Beloit, Illinois Project) Series 1985;

**Franklin Grove Health Care Center** - $3,000,000 Franklin Grove Health Care Corporation First Mortgage Revenue Bonds (Faith Evangelistic Mission Corporation Project) Series 1984;

**Freeport Manor** - $3,700,000 First Mortgage Revenue Bonds (First Humanics Corporation - Freeport, Illinois Project) Series 1985;

**Henry Clay Villa** - $3,400,000 Tri-State Health Care Corporation First Mortgage Revenue Bonds (First Humanics Corporation - Henry Clay Township, Fayette County, Pennsylvania Project) Series 1984;

**Hillsboro Health Care Center** - $2,915,000 Tax Exempt First Mortgage Health Facility Revenue Bonds (First Humanics Corporation Project) Series 1986 and the $310,000 Taxable First Mortgage Health Facility Bonds (Hillsboro, Illinois Project) Series 1986;

**Lakeland Health Care Center** - $4,800,000 First Mortgage Revenue Bonds (Faith Evangelistic Mission Corporation - Effingham, Illinois Project) Series 1984;

**McHenry Villa** - $7,850,000 City of McHenry, Illinois First Mortgage Revenue Bonds (First Humanics - McHenry, Illinois Project) Series 1986;

**Marigold Health Care Center** - $6,200,000 Tax Exempt First Mortgage Health Facility Revenue Bonds (First Humanics Corporation - Galesburg, Illinois Project) Series 1986 and the $500,000 Taxable First Mortgage Health Facility Bonds (Galesburg, Illinois Project) Series 1986;

**Medicos Recovery Care Center** - $6,955,000 Tax Exempt Limited Obligation Revenue Bonds (First Humanics Corporation Project) Series 1987 and the $530,000 Taxable First Mortgage Health Facility Bonds (Detroit, Michigan Project) Series 1987;

**Oak Manor** - $3,220,000 First Mortgage Revenue Bonds (First Humanics Corporation - Decatur, Illinois Project) Series 1985;

**Pana Health Care Center** - $1,320,000 Tax Exempt Bonds Pana, Illinois - City of Pana, Illinois First Mortgage Health Facility Revenue Bonds (First Humanics - Pana, Illinois Project) Series 1986 and the $145,000 Taxable Bonds First Humanics Corporation First Mortgage Health Facility Bonds (Pana, Illinois Project) Series 1986);

**Polo Continental Manor** - $2,150,000 First Mortgage Revenue Bonds (First Humanics Corporation - Polo, Illinois Project) Series 1984;

Exhibit A Page 56

**Sullivan Health Care Center** - $3,330,000 Tax Exempt First Mortgage Health Facility Revenue Bonds (First Humanics Corporation Project) Series 1986 and the $355,000 Taxable First Mortgage Health Facility Bonds (Sullivan, Illinois Project) Series 1986;

**Sunshine Manor** - $3,700,000 First Mortgage Health Facility Revenue Bonds (First Humanics --Carlinville, Illinois Project) Series 1985;

**Toulon Health Care Center** - $4,450,000 Tax Exempt First Mortgage Health Facility Revenue Bonds (First Humanics Corporation Project) Series 1986 and the $535,000 Taxable First Mortgage Health Facility Bonds (Toulon, Illinois Project) Series 1986;

**Watseka Health Care Center** - $3,500,000 Tax Exempt First Mortgage Health Facility Revenue Bonds (First Humanics Corporation Project) Series 1986 and the $375,000 Taxable First Mortgage Health Facility Bonds (Watseka, Illinois Project) Series 1986; and

**Westridge Health Care Center** - $4,600,000 Economic Development Revenue Bonds (First Humanics Corporation Project) Series 1985.

Tutera continues to manage the nursing homes owned by MidAmerica Care Foundation, f/k/a First Humanics Corporation, which are being successfully operating under the company's confirmed chapter 11 plan of reorganization.

### In re: South Park Care Associates, Inc.
United States Bankruptcy Court for the Western
District of Missouri, Western Division,
Case No. 94-42992-11

South Park Care Center is a 178 licensed bed skilled nursing facility located in Kansas City, Missouri for which Tutera acted as the debtor's post-petition manager and debtor in possession lender in the total amount of $250,000. Tutera, with the support of LTC Properties, Inc. and the Official Unsecured Creditors' Committee, proposed and confirmed a plan of reorganization in October, 1995 whereby a newly formed limited partnership (whose general partner is a limited liability company wholly owned by Tutera and whose limited partners are the debtor's unsecured creditors) purchased this project through the assumption of various secured debts pursuant to 11 U.S.C. § 363(f) and Tutera is currently operating the facility for the limited partnership.

3

### In re: Third and Oak Corporation
United States Bankruptcy Court for the Western
District of Kentucky, Louisville Division,
Case No. 94-32247-11

Tutera acted as a special advisor to Mark Twain Bank, as Successor Indenture Trustee for the $22,370,000 County of Jefferson (Kentucky) First Mortgage Residential Care Facilities Revenue Bonds (Treyton Oak Towers Economic Development Project) Series 1988, in connection with the debtor's chapter 11 bankruptcy proceeding until the debtor's plan was confirmed in August, 1995.

### In re: The SterlingCare Group, Ltd.
United States Bankruptcy Court for the Southern
District of Indiana, Indianapolis Division,
Case No. 92-9594-RLB-11

The SterlingCare Group, Ltd. filed a voluntary chapter 11 petition for relief on September 18, 1992. On October 30, 1992, Tutera became the post-petition manager of the following seven (7) facilities:

**Anderson Healthcare Center** - a 175 bed skilled nursing facility located in Anderson, Indiana;

**Chelsea Manor** - a 165 bed skilled nursing facility located in Elkhart, Indiana;

**Lafayette Healthcare Center** - a 202 bed skilled nursing facility located in Lafayette, Indiana;

**New Castle Healthcare Center** - a 195 bed skilled nursing facility located in New Castle, Indiana;

**Sheffield Manor** - a 123 bed skilled nursing facility located in Franklin, Indiana;

**Wabash Healthcare Center** - a 108 bed skilled nursing facility located in Wabash, Indiana; and

**Washington Manor** - a 199 bed skilled nursing facility located in Evansville, Indiana.

Tutera also provided a debtor in possession loan in the total amount of $1,250,000. During the course of this case, Tutera prepared and filed a plan of reorganization proposing to assume the leases for these seven (7) facilities, which had a collective value in excess of $20,000,000, and operate the facilities for the benefit of the creditors. However, prior to the confirmation of the Tutera plan, the State of Indiana enacted Rule 14, which dramatically changed the method by which Medicaid payments were being reimburse to Indiana providers

4

and made the continued operation of the homes unprofitable. Upon the advice of Tutera, the Bankruptcy Court authorized the debtor to reject the leases for the seven (7) facilities and to hand them back to their respective landlords.

### In re: Brook Meade Health Care Center, Inc.
United States Bankruptcy Court for the Middle
District of Tennessee, Nashville Division,
Case No. 391-04724-11

Tutera prepared and filed a plan of reorganization proposing to purchase this long term care facility through a refunding the $4,900,000 Health and Educational Facilities Board of the Metropolitan Government of Nashville and Davidson County, Tennessee Industrial Revenue Bonds (Brook Meade Health Care Center Project) Series 1985 and the $575,000 Health and Educational Facilities Board of the Metropolitan Government of Nashville and Davidson County, Tennessee Industrial Revenue Bonds (Brook Meade Health Care Center Project) Series 1986. While Tutera was not ultimately the successful plan proponent, Tutera was paid a "break up fee" not to pursue its plan. In addition, Tutera's actions directly caused five (5) other competing plans to be filed proposing to purchase the facility through a refunding of the industrial revenue bonds at substantially higher interest rates than were originally proposed by the debtor in its plan.

### Mattoon Convalescent Care Center
Mattoon, Illinois

Tutera, through Mattoon, Inc., a wholly owned subsidiary of TGI, has been acting as the receiver for this Illinois nursing home since April, 1991 in conjunction with a foreclosure proceeding filed by South Side National Bank in St. Louis, as Indenture Trustee for the $5,650,000 City of Mattoon, Illinois First Mortgage Revenue Bonds (Mattoon Manor Project) Series 1985. In conjunction with the rehabilitation of a portion of the facility, Tutera arranged for a substantial capital improvement loan which was made by various bondholders and Tutera to finance the completion of the capital improvements scheduled to be made to the facility.

### Bayou Villas
Pensacola, Florida

Tutera, through a wholly owned subsidiary, managed this Florida nursing home at the request of the debtor and Barnett Bank, as Successor Indenture Trustee for the $3,700,000 Pensacola Care, Inc. First Mortgage Revenue Bonds Series 1980, from October, 1992 until the facility was sold by Barnett Bank in 1996.

5

**In re: Gallatin Health Care Associates**
United States Bankruptcy Court for the Middle
District of Tennessee, Nashville Division,
Case No. 395-09504

Tutera acted as a consultant and special advisor to the debtor's general partner in connection with the formulation, negotiation and financing of the debtor's chapter 11 plan of reorganization. The major component of the plan was the refinancing of the $6,700,000 Health, Educational and Housing Facilities Board of the County of Sumner, Tennessee Revenue Bonds, Series 1986 (Gallatin Health Care Associates Project) through the private placement of $5,200,000 refunding tax exempt bonds and a $900,000 taxable note with a single sophisticated investor located by Tutera. The debtor's confirmed plan became effective on August 1, 1997, at which time Tutera became the manager of this 200 bed long term care facility. Tutera also provided a post-confirmation working capital line of credit in the amount of $300,000.

**In re: The Phoenix Rehabilitation Center, Inc.**
United States Bankruptcy Court for the
District of Kansas, Topeka Division,
Case No. 97-41334-11

The Phoenix Rehabilitation Center, Inc. is a Kansas not-for-profit corporation which owned The Phoenix Nursing & Rehabilitation Center, a 235 licensed bed skilled nursing facility located in Olathe, Kansas. Tutera provided post-petition management and consulting services, as well as a debtor in possession loan in the total amount of $150,000, to the owner as a part of its chapter 11 bankruptcy proceeding filed on May 16, 1997. At the time that the chapter 11 bankruptcy was filed, the facility was the subject of a de-certification proceeding and its Medicaid provider agreement was set to terminate on June 9, 1997.

Upon receiving the approval of the Bankruptcy Court on May 23, 1997, Tutera immediately placed several of its own highly qualified on-staff professionals at the facility to begin addressing the numerous deficiencies previously cited by the Kansas Department of Health & Environment ("KDHE") prior to the bankruptcy. However, notwithstanding the best efforts of Tutera, KDHE ultimately determined that the facility could not be brought into substantial compliance by the June 9, 1997 deadline based upon the deficiencies which existed prior to the filing of the chapter 11 case. Tutera thereafter agreed to oversee and finance the closing of the facility in accordance with applicable law, which was accomplished in conjunction with Tutera's purchase of the first mortgage loan in the approximate amount of $4,450,000 which was held against the facility.

Following the closure of the facility, Tutera actively assisted the owner and the other two (2) junior mortgage holders in marketing the facility for an auction sale conducted by the Bankruptcy Court on September 3, 1997, at which time Tutera purchased the facility pursuant to a credit bid which was submitted in accordance with 11 U.S.C. § 363(k) in an amount equal to the first mortgage note which had been previously purchased by Tutera. Tutera has

6

subsequently leased this facility to a not-for-profit corporation affiliated with the Catholic Church, who is currently operating the facility.

### In re: Stonebridge, L.L.C., et al.,
United States Bankruptcy Court for the Eastern
District of Louisiana
Case No.'s 97-14854, 97-14855, 97-14856,
97-14857, 97-14858 and 97-14859
(Jointly Administered)

On August 29, 1997, Stonebridge, L.L.C., Audubon Living Center, Inc., Carrollton-Glyndana, L.P., Flower Mound-Glyndana, L.P., Glenn Laborde, Inc., and Glyndana-Windsor, L.P., filed voluntary chapter 11 petitions for relief. On October 1, 1997, Tutera became the post-petition manager of the following six (6) facilities that are owned or leased by the above-referenced debtors:

> **Stonebridge Convalescent Center**- a 240 bed skilled nursing facility located in Gretna, Louisiana;

> **Audubon Living Center** - a 150 bed skilled nursing facility located in Hammond, Louisiana;

> **Twin Pines Care Center** - a 120 bed skilled nursing facility located in Carrollton, Texas;

> **Cross Timbers Care Center** - a 120 bed skilled nursing facility located in Denton, Texas;

> **Amite Nursing Home** -- a 100 bed skilled nursing facility located in Amite, Louisiana; and

> **Windsor Care Center** - a 108 bed skilled nursing facility located in Terrell, Texas.

Upon the advice of Tutera, the leases for Twin Pines and Audubon were rejected by their respective debtors in November 1997 and February 1998 as neither facility was able to generate a profit after payment of its lease obligations. On July 23, 1998, the Bankruptcy Court confirmed plans of reorganization for Stonebridge, Cross Timbers, Amite and Windsor which provided for the restructuring of debts totaling in excess of $20,000,000, including approximately $13,000,000 in long term debt held by Bank One Louisiana, N.A.

### Belwood Nursing Home
Peoria County, Illinois

Tutera acted as a consultant and special advisor with respect to the operation of Belwood Nursing Home, which is owned and operated by Peoria County, Illinois. In addition

7

to providing Peoria County, Illinois with a licensed administrator, Tutera submitted a proposal to manage Belwood Nursing Home for Peoria County, Illinois for the next several years. However, Peoria County, Illinois ultimately decided to retain the ownership and operation of Belwood for itself and Tutera thereafter terminated its services in accordance with its contract.

### In re: Fountain Manor, Inc.
United States Bankruptcy Court for the
Eastern District of Louisiana
Case No. 98-15367-B-11

Fountain Manor, Inc., a Louisiana corporation ("FMI"), owns Fountain Manor, a 131 licensed bed skilled and intermediate care nursing facility located in East New Orleans, Louisiana. On September 3, 1998, the Bankruptcy Court appointed a chapter 11 trustee to take over the management and operation of FMI and the facility. The chapter 11 trustee thereafter immediately engaged Tutera to provide management services at the facility. Upon receiving the approval of the Bankruptcy Court, Tutera immediately assigned several of its own highly qualified on-staff professionals to begin addressing the numerous operational and physical plant problems at the facility. Tutera managed this facility for the chapter 11 trustee until it was eventually be sold through a bankruptcy court auction after Tutera had stabilized its operations.

### Armour Assisted Living Facility, Inc.
Kansas City, Missouri

On January 14, 1999, Tutera was engaged by the state court appointed receiver to manage and close this 120 unit residential care II facility located in Kansas City, Missouri following the receiver's appointment upon the request of the Missouri Department of Social Services, Division of Aging.

### In re: Carewell Corporation of Oklahoma, Inc., et al.,
United States Bankruptcy Court for the Western
District of Missouri, Western Division,
Case No. 99-40827-1-11, et seq.
(Jointly Administered)

On March 8, 1999, Carewell Corporation of Oklahoma, Inc., together with six (6) wholly owned limited liability companies (collectively "Carewell"), filed voluntary chapter 11 petitions for relief. Tutera managed these nine (9) facilities owned and operated by Carewell until the facilities were ultimately transferred back to Carewell's respective secured creditors upon the advice of Tutera following a determination that the terms and conditions by which such lenders would agree to such a transfer would be far in excess of what general unsecured creditors would receive if the Debtors' were to reorganize under chapter 11.

**In re: Axiom Healthcare Services, Inc., et al.,**
United States Bankruptcy Court for
the Eastern District of Louisiana
Case No.'s 99-11875-11, et seq.
(Jointly Administered)

On April 14, 1999, Axiom Healthcare Services, Inc., together with six (6) wholly owned limited liability companies (collectively "Axiom"), filed voluntary chapter 11 petitions for relief. Pursuant to an order entered by the Bankruptcy Court on or about April 19, 1999, Tutera began managing the following six (6) skilled nursing facilities leased or owned and operated by Axiom that are located in the State of Oklahoma:

**Ardmore Care Center** - a 76 bed skilled nursing facility located in Ardmore, Oklahoma;

**Blevins Retirement & Care Center** - a 95 bed skilled nursing facility located in McAlester, Oklahoma;

**Cyril Nursing Home** - an 80 bed skilled nursing facility located in Cyril, Oklahoma;

**Rosewood Manor Nursing Center** - a 200 bed skilled nursing facility located in Norman, Oklahoma;

**Stratford Nursing Center** - a 57 bed skilled nursing facility located in Stratford, Oklahoma;

**Texoma Manor** - a 60 bed skilled nursing facility located in Kingston, Oklahoma;

Tutera also provided Axiom with a debtor in possession line of credit in the total amount of $500,000 for use as working capital at the facilities. Shortly following the filing of the proceeding, Tutera determined that Axiom would be unable to reorganize its affairs, primarily since five (5) of the facilities were leased by Axiom and the landlord was unwilling to make the concessions necessary to allow the facilities to operate profitably. Therefore, upon the advice of Tutera, the Court rejected the leases for the five (5) facilities effective as of June 11, 1999, thereby preserving the ability of Axiom to pay its administrative expense claims owing to creditors.

**Blue Hills Care Center**
Kansas City, Missouri

On July 12, 1999, Tutera was appointed by the Missouri Department of Social Services, Division of Aging and the licensed operator of the facility to serve as the temporary manager to manage and close this 180 bed skilled nursing facility leased and operated by an affiliate of Lenox Healthcare located in Kansas City, Missouri, which has a population of 132 residents upon the date of appointment. Within approximately 3 weeks of being appointed as receiver, Tutera successfully relocated these residents and closed the facility in accordance with applicable law.

9

**In re: Oakwood Village Nurse Care Center, Inc., et al.**
United States Bankruptcy Court for
the Western District of Louisiana
Case No. 00-50485 (Jointly Administered)

On March 9, 2000, Geriatrics, Inc., a Louisiana corporation ("Geriatrics") and six (6) wholly owned subsidiaries filed Voluntary Chapter 11 Petitions for Relief with the United States Bankruptcy Court for the Western District of Louisiana. The subsidiaries own and operate following long term care facilities, multi-handicapped center and group homes for the developmentally disabled:

**Holly Hill House** - a 235 bed skilled nursing facility located in Sulphur, Louisiana;

**Moss Bluff Manor** - a 92 bed skilled nursing facility located in Lake Charles, Louisiana;

**Greenhill Nursing Home** - an 80 bed skilled nursing facility located in DeQuincy, Louisiana;

**Rosewood Nursing Center** - a 158 bed skilled nursing facility located in Lake Charles, Louisiana;

**Oakwood Village Nurse Care Center** - a 160 bed skilled nursing facility located in Lafayette, Louisiana; and

**Calcasieu Multi-Handicapped Center and Group Homes I-V** - a 30 bed multi-handicapped center and five 6-8 bed group homes located in Vinton and Sulphur, Louisiana.

Tutera also initially proposed to provide the Debtors with a debtor in possession loan in the total amount of $1,500,000, which caused the Debtors' primary secured creditor to agree to provide a debtor in possession loan in the amount of $1,750,000 on virtually identical terms and conditions. Tutera subsequently made a $500,000 debtor in possession loan to the Debtors. Subsequent to the confirmation of the Debtors' plan of reorganization, Tutera made a $5,300,000 loan to take out Hibernia National Bank, which had previously held the first mortgage indebtedness secured by the facilities.

**In re: Brentwood Nursing and Rehabilitation Center, Inc.**
United States Bankruptcy Court for
the Northern District of Illinois

On March 24, 2000, Brentwood North Nursing and Rehabilitation Center, Inc., an Illinois corporation ("Brentwood"), together Riverwoods Associates ("Riverwoods") each filed Voluntary Chapter 11 Petitions for Relief with the United States Bankruptcy Court for the Southern District of Florida, which cases were later transferred to the United States

10

Exhibit _A_, Page _64_

Bankruptcy Court for the Northern District of Illinois (the "Court"). Riverwoods owns and leases Brentwood Nursing and Rehabilitation Center, a 244 licensed bed skilled care and rehabilitation facility located near Deerfield, Illinois (the "Facility") to Brentwood. Tutera took over the management of Brentwood immediately prior to the filing of the chapter 11 proceedings and, in conjunction therewith, offered to make a debtor in possession loan in the amount of $500,000 available to Brentwood. However, this offer ultimately caused Brentwood's primary working capital lender to make a $500,000 debtor in possession loan available to Brentwood on virtually identical terms and conditions as those offered by Tutera. Tutera managed this facility until it was eventually sold on July 20, 2001 through a bankruptcy court auction after Tutera had stabilized its operations.

### Holmesdale Care Center
Kansas City, Missouri

On July 1, 2000, Tutera took over the day-to-day management of Holmesdale Care Center for the landlord of this facility following the rejection of a lease by an affiliate of Integrated Health Services, Inc. ("IHS") in conjunction with IHS's chapter 11 proceeding pending before the United States Bankruptcy Court for District of Delaware. Tutera and the landlord worked in unison with the Missouri Department of Social Services, Division of Aging to cause this facility to be closed and all of its residents relocated to other facilities in the Kansas City area by July 10, 2000.

### Senior Living Properties, LLC

On October 1, 2000, Tutera took over the day-to-day management of thirty-one (31) long term care facilities located in the State of Illinois which are owned by Senior Living Centers, LLC ("SLP"). These facilities, together with an additional fifty-five (55) facilities located in Texas which are owned by SLP but which are not managed by Tutera, serve as the collateral for a $225,000,000 loan provided to SLP by GMAC Commercial Mortgage Credit Corporation ("GMAC"). Tutera was selected as the replacement third party manager for these thirty-one (31) facilities following an extensive interview process jointly conducted by SLP, GMAC and ZC Specialty Insurance Company, which has issued a surety bond in the amount of $140,000,000 to secure, in part, repayment of the obligations owing by SLP to GMAC. With this engagement, Tutera became the largest manager of long term care facilities in the State of Illinois.

On May 14, 2002, SLP filed a voluntary chapter 11 bankruptcy proceeding in United States Bankruptcy Court for the Northern District of Texas, Dallas Division, Case No. 02-34243-RCM-11. Tutera completed its term as manager for these facilities on July 31, 2003 after assisting SLP with the reorganization of its debts pursuant to this proceeding.

Exhibit A Page 65

### Oak Forest North, L.L.C.
St. Louis, Missouri

On February 5, 2001, Tutera took over the day-to-day management of Oak Forest North, a 120 bed long term care in accordance with a Consent Agreement entered into by and between Oak Forest North, L.L.C. ("Oak Forest") and the Missouri Department of Social Services, Division of Aging ("MDOA") whereby Oak Forest was permitted by the MDOA to engage Tutera as its manager in lieu of having MDOA revoke its license for failing to cure certain survey deficiencies which occurred while Oak Forest was operating the facility. Tutera ceased managing this facility on July 9, 2001 when Oak Forest, together with its various affiliates, leased all of their respective properties to a new third party operator.

### Grand Court II – Chattanooga
Chattanooga, Tennessee

On March 1, 2001, Tutera took over the day-to-day management of the Grand Court II – Chattanooga, which is a 142 unit independent living and assisted living facility located in Chattanooga, Tennessee. This facility was previously operated by Grand Court Lifestyles, Inc., who is currently involved in a chapter 11 proceeding pending before the United States Bankruptcy Court for District of New Jersey. Tutera's engagement was arranged by CRIIMI MAE Services, L.P., as the subservicer for the first mortgage loan which is the subject of a foreclosure action.

### Sunbridge Care Center at Jackson
Jackson, California

On April 23, 2001, Tutera took over the day-to-day management of Sunbridge Care Center for the landlord of this long term care facility following the rejection of a lease by an affiliate of Sun Healthcare Group ("Sun") in conjunction with Sun's chapter 11 proceeding pending before the United States Bankruptcy Court for District of Delaware. Tutera and the landlord, together with FINOVA Capital Corporation ("FINOVA"), which holds a first mortgage lien in the facility, worked in unison to take back the operations for Sun and to operate the facility for the benefit of the owner upon the issuance of a license by the State of California. In conjunction with the management of this facility, Tutera is providing the owner with access to a $1,050,000 line of credit for which FINOVA has agreed to subordinate its first mortgage liens and security interests to secure repayment of such loan.

12

## The Manor
Las Vegas, Nevada

On August 15, 2001, Tutera was appointed the receiver for The Manor, a 225 bed skilled nursing facility located in Las Vegas, Nevada which opened in 1999, in conjunction with a legal proceeding filed by Key Corporate Capital, Inc. ("Key") seeking to foreclose on the facility based upon the borrowers' default on indebtedness owing to Key in excess of $16,000,000. In conjunction with its appointment as receiver, Tutera not only assumed all responsibility for the day to day management of the facility, but also the marketing and sale negotiations for the purchase of the facility to a third party through a foreclosure sale.

## Medford Nursing Center
Medford, Oklahoma

Tutera was engaged as the accounting consultant for the receiver for this Oklahoma nursing home in January 2002 in conjunction with a foreclosure proceeding filed by the first mortgage lender in the United States District Court for the Western District of Oklahoma.

## IHS of Bridgewood
Kansas City, Missouri

Tutera acquired this long term care facility from an affiliate of Integrated Health Services, Inc. ("IHS") in conjunction with IHS's chapter 11 proceeding pending before the United States Bankruptcy Court for District of Delaware. Tutera, together with FINOVA, which holds a first mortgage lien in the facility, worked in unison to take back the operations from IHS on or about March 1, 2002. In conjunction with the acquisition of this facility, Tutera provided the new owner with access to a $1,000,000 line of credit for which FINOVA agreed to subordinate its first mortgage liens and security interests to secure repayment of such loan.

## IHS of Cambridge
Indianapolis, Indiana

Tutera acquired this long term care facility from an affiliate of IHS in conjunction with IHS's chapter 11 proceeding pending before the United States Bankruptcy Court for District of Delaware. Tutera, together with FINOVA, which holds a first mortgage lien in the facility, worked in unison to take back the operations from IHS on or about March 1, 2002. In conjunction with the acquisition of this facility, Tutera is providing the new owner with access to a $1,000,000 line of credit for which FINOVA agreed to subordinate its first mortgage liens and security interests to secure repayment of such loan.

Exhibit _A_, Page _67_

## Grand Court II – Kansas City
Kansas City, Kansas

On March 21, 2002, Tutera was engaged by the receiver to begin the day-to-day management of the Grand Court II – Kansas City, Kansas, which is a 127 unit independent living and assisted living facility located in Kansas City, Kansas. Tutera's engagement was arranged by Brotherhood Bank & Trust Company, which holds the first mortgage loan which was the subject of a foreclosure action.

## In re: TriNat Health Care, Inc.
United States Bankruptcy Court for the Southern
District of Indiana, Indianapolis Division
Case No. 02-06360-JKC-11

TriNat Health Care, Inc. filed a voluntary chapter 11 petition for relief on April 15, 2002. TriNat leases and operated nine (9) long term care facilities located in Indiana. Tutera took over the management of the TriNat facilities immediately prior to the filing of the chapter 11 proceeding and, in conjunction therewith, offered to make a debtor in possession loan in the amount of $500,000 available to TriNat. However, shortly following the filing of the proceeding, the State of Indiana implemented a drastic Medicaid rate decrease that reduced the overall annual revenue for these nine (9) homes by approximately $2,800,000. Tutera determined that TriNat would be unable to reorganize its affairs, primarily since TriNat leased its facilities and the landlord was unwilling to make the concessions necessary to allow the facilities to operate profitably. Therefore, upon the advice of Tutera, the Court rejected the leases for the nine (9) facilities effective as of June 30, 2002, thereby preserving the ability of TriNat to maximize its distributions to creditors.

## In re: Metro Health/Indiana, Inc.
United States Bankruptcy Court for the Northern
District of Georgia, Atlanta Division
Case No. 02-63019

Metro Health/Indiana, Inc. filed a voluntary chapter 11 petition for relief on March 19, 2002. Metro owns and operates twenty (20) long-term care facilities located in Indiana. On September 20, 2002, Tutera was appointed as the oversight manager and consultant for the Metro Health/Indiana facilities. Tutera's primary duties included reviewing and commenting on Metro's operations in an effort to improve the profitability and efficiency of the facilities, as well as recommending changes in the owner's operating procedures and confirming whether certain facilities should be sold or closed and the feasibility of any plan of reorganization proposed by Metro. These facilities were ultimately sold in the chapter 11 proceeding.

14

### Maplewood Nursing and Rehabilitation Center
Monroe, Louisiana

On November 19, 2002, Tutera was appointed as the receiver of Maplewood Nursing and Rehabilitation Center, a 99 bed licensed skilled nursing care facility located in Monroe, Louisiana. Tutera's engagement was requested by Bank One Trust Company, N.A., the indenture trustee of the tax-exempt bonds that encumbered the facility. This facility was sold pursuant to a foreclosure sale conducted in August 2003.

### In re: Mariner Post-Acute Networks, Inc.
United States Bankruptcy Court for the
District of Delaware
Case Nos. 00-113 (MFW) through 00-214 (MFW)

On December 1, 2002, Tutera assisted LaSalle Bank National Association (formerly known as LaSalle National Bank), as Trustee under that certain Pooling and Servicing Agreement effective as of December 1, 1995, relating to the RMF Commercial Mortgage Pass-Through Certificates, Series 1995-1 (the "Lender"), in taking back three (3) long term care facilities located in Illinois from Mariner in conjunction with Mariner's chapter 11 bankruptcy proceeding. Tutera thereafter began leasing and operating the facilities and is providing the new operators with access to a $1,500,000 line of credit.

### Country Gardens
Norcross, Georgia

On January 21, 2003, Tutera was appointed as the receiver for the operating tenant of Country Gardens, a 27 bed assisted living facility located in Norcross, Georgia. Tutera's appointment was requested by CRIIMI MAE Services, L.P., as the subservicer for the first mortgage loan that is the subject of a foreclosure action. The lender subsequently foreclosed upon the facility and began leasing it to an affiliate of Tutera pending its ultimate disposition.

### The Plaza at Sun Mountain and
### The Regency Plaza at Sun Mountain
Las Vegas, Nevada

On March 11, 2003, Tutera was appointed the receiver for The Plaza at Sun Mountain, a 179 unit assisted living facility, and The Regency at Sun Mountain, a 188 licensed bed skilled nursing facility, both of which are located in Las Vegas, Nevada. Tutera was appointed in conjunction with a legal proceeding filed by Lehman Brothers Holdings, Inc. ("Lehman Brothers") seeking to foreclose on the facility based upon the borrowers' default on indebtedness owing to Lehman Brothers in excess of $20,000,000. The lender subsequently foreclosed upon these facilities and Tutera continues to manage these facilities for the benefit of the secured lender.

Exhibit __A__ Page 69

### In re: Southern Healthcare Systems, Inc.
United States Bankruptcy Court for the Middle
District of Louisiana, Baton Rouge Division
Case No. 02-11621

Southern Healthcare Systems, Inc. filed a voluntary chapter 11 petition for relief on June 11, 2002. Southern owns and operates six (6) long-term care facilities located in Texas, Kentucky and Tennessee. On December 11, 2002, a chapter 11 trustee was appointed to serve in the case. On April 29, 2003, the chapter 11 Trustee engaged Tutera as the oversight manager and consultant for Southern's facilities. Tutera's primary duties include reviewing and commenting on the clinical and accounting aspects of Southern's operations. These facilities were ultimately sold in the chapter 11 proceeding.

### Grand Court II – Overland Park
Overland Park, Kansas

On June 7, 2003, Tutera was appointed the receiver for the Grand Court II – Overland Park, which is a 100 unit assisted living facility located in Overland Park, Kansas. Tutera's appointment was arranged by The Mission Bank, which holds the first mortgage loan which is the subject of a pending foreclosure action. The lender subsequently foreclosed upon the facility and Tutera continues to manage the facility for the benefit of the lender pending its ultimate disposition.

### The Vyne at Crestview
Wichita, Kansas

On November 24, 2004, Tutera was engaged by the receiver to manage The Vyne at Crestview, an assisted living facility located in Wichita, Kansas. Tutera's appointment was arranged through TouchStone Asset Management LLC, as servicer for Asset Solutions Group Trading CDE, LLC/TC10 Grantor Trust, which has filed a foreclosure action against its collateral.

### Caravilla Charitable Corporation
Mount Vernon, Illinois

On February 2, 2005, Tutera was engaged by the Receiver appointed by the Circuit Court of the Second Judicial Circuit, Jefferson County, Illinois to manage Casey Care Center, Jeffersonian Care Center and Mount Vernon Care Center, all three of which are skilled nursing facilities located in Mount Vernon, Illinois which are owned by Caravilla Charitable Corporation, an Illinois not-for-profit corporation. Tutera's engagement was arranged through Midland Loan Services, Inc., as servicer for PAMI MidAtlantic LLC, who is the holder of the first mortgage indebtedness encumbering the facilities.

16

## Austin Nursing Center
Austin, Texas

On February 2, 2005, Tutera was engaged by the Receiver appointed by the Circuit Court of the 200th Judicial Circuit, Travis County, Texas (the "Court"), in an action styled: TC10 Grantor Trust, Plaintiff, vs. Century Care of America, Inc. et al., Defendants., Case No. GN501-879 (the "Action") to manage Austin Nursing Center, a 170 bed skilled nursing facility located at 110 E. Live Oak at Congress, Austin, Texas. Tutera's engagement was arranged through Touchstone Asset Management, LLC, as servicer for TC10 Grantor Trust, who is the holder of the first mortgage indebtedness encumbering the facility.

## In re: Robert E. Lee Investors, L.L.C.
United States Bankruptcy Court for the Southern
District of Indiana, New Albany Division
Case No. 05-92641-BHL-11

Robert E. Lee Investors, L.L.C. filed a voluntary chapter 11 petition for relief on July 8, 2005. The Debtor owns and operates a skilled nursing and assisting living facility located in New Albany, Indiana. On January 26, 2007, a Chapter 11 Trustee was appointed to serve in the case. On January 31, 2007, the Chapter 11 Trustee engaged Tutera as the oversight manager and consultant for the facility.

17

# Exhibit "B"

# LTC SERVICES, L.L.C.
## 7611 STATE LINE ROAD, SUITE 301
## KANSAS CITY, MO 64114
## (816) 444-0900

April 1, 2007

Mr. Emmanuel I. Bernabe
Ember Care Corporation
2258 Foothill Blvd.
La Canada, California 91011

> Re: Retention Agreement for LTC Services, L.L.C.
> Regarding The Following Five Jointly Administered
> Chapter 11 Bankruptcy Cases:
>
> Pleasant Care Corporation, Case No. LA 07-12312-EC
> SNF Properties Incorporated, Case No. LA 07-12316-EC
> PCC Health Services, Inc., Case No. LA 07-12319-EC
> Atlas Care Enterprises, Inc., Case No. LA 07-12322-EC
> Ember Care Corporation, Case No. LA 07-12326-EC

Dear Mr. Bernabe:

This will confirm the understanding and agreement ("Agreement") between Pleasant Care Corporation, SNF Properties Incorporated, PCC Health Services, Inc., Atlas Care Enterprises, Inc., and Ember Care Corporation, each a California corporation, jointly administered Chapter 11 debtors and debtors in possession in the above referenced Chapter 11 bankruptcy cases pending before the United States Bankruptcy Court, Central District of California, Los Angeles Division (collectively, the "Debtors"), on the one hand, and LTC Services, L.L.C., a Missouri limited liability company ("LTC Services"), Joseph C. Tutera ("JT") and Carol Van Horst ("CVH"), on the other hand, regarding the Debtors' employment of JT as the Debtors' President and Chief Operating Officer ("COO") and the Debtors' employment of CVH as the Debtors' Chief Clinical Officer ("CCO").

1.    Scope of Engagement. JT is hereby employed as the Debtors' President and COO, with full and complete control over the Debtors' business operations. JT shall have exclusive control over, and decision making power with respect to, the Debtors' day-to-day business operations, including, but not limited to, the following:

      i.    the retention, hiring and termination of employees of the Debtors;

Exhibit _B_ Page 73

April 1, 2007
Page 2

     ii.     the purchasing of food, inventory, materials and other products necessary for the Debtors' operation and management of their nursing home and residential care facilities and business offices and interfacing with suppliers;

     iii.     interfacing with governmental agencies on behalf of the Debtors, including, but not limited to, the California Department of Health Services, the Internal Revenue Services, the Franchise Tax Board, the State Board of Equalization, the Office of the United States Trustee;

     iv.     governmental and regulatory compliance;

     v.     interfacing with the Debtors' unions;

     vi.     managing the Debtors' business operations and cash flows and nursing home and residential care facilities;

     vii.     interfacing with the Debtors' secured creditors, including negotiating financing and cash collateral agreements for the Debtors and executing financing and cash collateral agreements and related pleadings filed with the Bankruptcy Court;

     viii.     managing the Debtors' cash flow and finances, including billings, collections and payables;

     ix.     working with the Debtors' secured creditors with regard to preparing cash flow projections and preparing reports showing the difference between the Debtors' cash flow projections and actual operating performance;

     x.     overseeing the preparation of the Debtors' operating reports to be filed with the Office of the United States Trustee;

     xi.     overseeing the preparation of the Debtors' initial filing requirements, schedules of assets and liabilities, and statements of financial affairs;

     xii.     overseeing the preparation of payroll reports for governmental agencies;

     xiii.     overseeing and assisting the Debtors in the development of strategic business plans;

     xiv.     implementing any and all organizational and operational structures;

Exhibit 8 PAGE 73

April 1, 2007
Page 3

xv.     interfacing with the Debtors' creditors and the Official Committee of Unsecured Creditors formed in the Debtors' Chapter 11 cases (the "Committee");

xvi.    serving as the Debtors' point person with respect to the Bankruptcy Court, including executing pleadings, documents and papers filed by the Debtors with the Bankruptcy Court, executing declarations in support of the Debtors' pleadings, appearing at Bankruptcy Court hearings as required, and appearing as the primary representative of the Debtors at meetings conducted by the Office of the United States Trustee, including the Initial Debtor Interview and the 341(a) Meeting of Creditors;

xvii.   the retention, hiring and termination of any professionals of the Debtors in relation to the Debtors' Chapter 11 cases;

xviii.  the sale, assignment or transfer of any assets or facilities of the Debtors, subject to Mr. Bernabe's rights set forth in Paragraph 10 below; and

xix.    the proposal of a plan of reorganization in these Chapter 11 cases, subject to Mr. Bernabe's rights set forth in Paragraph 11 below.

2.      Staffing.  In addition to JT serving as the Debtors' President and COO, JT shall cause LTC Services to provide the Debtors' with whatever additional staffing is required by the Debtors to enable JT to perform his services as President and COO described above for the Debtors' benefit.  It is anticipated that JT will initially utilize up to three (3) additional employees of LTC Services to enable JT to perform his services as President and COO described above for the Debtors' benefit.  In addition to the Debtors' employment of JT as the Debtors' President and COO and any other employees or representatives of LTC Services that JT will cause to provide services to the Debtors, the Debtors hereby employ CVH as the Debtors' CCO.  The general scope of responsibilities of CVH will be as set forth in Exhibit "1" hereto.  The Debtors and JT hereby acknowledge and agree that JT is not being engaged on a full-time basis hereunder; provided, however, that such acknowledgement shall not in any manner diminish JT's duties and obligations hereunder.  The Debtors and CVH hereby acknowledge and agree that CVH is being engaged on a full-time basis hereunder.  In the event that the Debtors are not able to hire the appropriate and qualified personnel to operate, or oversee the operation of, the Debtors' facilities, JT may place an employee of LTC Services to fill such vacant position and in such event, the Debtors shall pay to LTC Services the market cost of such personnel, including all fringe benefits.  The term "fringe benefits" as used herein shall include but not be limited to the LTC Services' contribution of FICA, unemployment compensation, and other employment taxes, retirement plan contributions, worker's compensation, group life, accident, health insurance premiums, disability, retirement and other similar benefits.

April 1, 2007
Page 4

3.     <u>Compensation; Superpriority Administrative Expense Claim Status</u>.   JT, LTC
Services and CVH will collectively receive total compensation of $150,000 per month, plus timely
reimbursement for their reasonable and actual out-of-pocket expenses, including any reasonable
attorney's fees, incurred in connection with providing services to the Debtors.  The Debtors and
JT hereby further agree that upon the Bankruptcy Court's entry of its Order approving this
Agreement, the Debtors shall reimburse JT the sum of $10,000 for JT's reasonable legal fees and
expenses incurred with Michael F. Flanagan, L.L.C. in connection with securing, negotiating and
documenting this transaction.  It is anticipated that CVH will be compensated at the flat rate of
$25,000 per month, and JT and LTC Services will collectively be compensated at the flat rate of
$125,000 per month.  Subject to the approval of the Bankruptcy Court, JT, LTC Services and
CVH will be compensated on a monthly basis, payable in advance each month, but shall still be
required to prepare and file final applications with the Bankruptcy Court at the conclusion of the
Debtors' bankruptcy cases or termination of JT as President and COO and/or CVH as CCO,
respectively.  Any cash collateral order or DIP financing order which is entered by the Bankruptcy
Court in the Cases following April 1, 2007 shall expressly provide for an irreparable carve-out for
the payment of all obligations due and owing to JT, CVH and/or LTC Services by the Debtors
hereunder.  Furthermore, all obligations due and owing to JT, CVH and/or LTC Services by the
Debtors hereunder shall constitute a superpriority administrative expense claim in the Cases and,
with the exception of any allowed fees and expenses granted in favor of the Debtors' counsel, any
quarterly fees owing to the Office of the United States Trustee and any unpaid post-petition
payroll taxes owing to any tax authority, shall have priority in payment pursuant to 11 U.S.C. §
364(c)(1) over all other costs and expenses incurred in the Cases which may be allowed pursuant
to 11 U.S.C. §§ 503(b) and 507(b). The superpriority status of the obligations hereunder shall be
affirmed in the Order entered by the Bankruptcy Court that authorizes the Debtors to enter into
this Agreement.

4.     <u>Timing of Employment</u>.   JT, LTC Services and CVH shall commence working for
the Debtors effective as of April 1, 2007.  The Debtors' employment of JT, LTC Services and
CVH shall be subject to the approval of the Bankruptcy Court, nunc pro tunc, to April 1, 2007,
pursuant to the terms of an order in a form acceptable to JT and CVH.  The Debtors shall attempt
to obtain such Bankruptcy Court approval in the most expeditious manner possible.

5.     <u>Indemnification</u>.   The Debtors hereby agree to indemnify and hold harmless JT and
LTC Services (along with LTC Services's officers, directors, members, principals, affiliates,
independent contractors, employees, and agents) and CVH (collectively, the "Indemnified
Persons" and, individually, "Indemnified Person") from and against any and all claims, demands,
suits, proceedings, judgments, awards, liabilities, losses, damages, and expenses incurred by any
Indemnified Person (including, but not limited to, any Indemnified Person's reasonable fees and

April 1, 2007
Page 5

disbursements), as they are incurred, arising in connection with investigating, preparing for, or defending any action, formal or informal claim, investigation, inquiry or other proceeding, whether or not in connection with pending or threatened litigation, which are related to or arise in any manner out of the engagement contemplated hereby, including any legal proceeding in which any Indemnified Person may be required or agree to participate, but in which such Indemnified Person is not a party; provided, however, that (a) in no event shall any Indemnified Person be indemnified for any claims, liabilities, losses, damages, or expenses that are (i) determined by the Bankruptcy Court to have resulted from the bad faith, self-dealing, breach of fiduciary duty, gross negligence, reckless or willful misconduct, or malpractice arising from the foregoing (other than ordinary negligence) of any Indemnified Person, or (ii) settled prior to a judicial determination as to that Indemnified Person's bad faith, self-dealing, breach of fiduciary duty, gross negligence, reckless or willful misconduct, or malpractice, but determined by the Bankruptcy Court, after notice and a hearing, to be claims, liabilities, losses, damages, or expenses for which that Indemnified Person should not receive indemnity, contribution or reimbursement under the terms of this Agreement; (b) all requests for payment pursuant to this Paragraph shall be made by means of application to the Bankruptcy Court, after notice and a hearing, and no payments may be made pursuant to this Paragraph except in accordance with a prior Bankruptcy Court order authorizing such payment; and (c) in the event that any such Indemnified Person seeks reimbursement for attorneys' fees or expenses from the Debtors under this Agreement, the invoices and supporting time records from such attorneys shall be included in such Indemnified Person's own fee application and such invoices and time records shall be subject to the United States Trustee's guidelines for compensation and reimbursement of expenses and the approval of the Bankruptcy Court under the standards of sections 330 and 331 of the Bankruptcy Code; and (d) the Bankruptcy Court shall retain exclusive jurisdiction over any disputes concerning the conduct of any party to this Agreement.

The Indemnified Person shall defend, or permit the Debtors to defend, any such claim, with counsel reasonably acceptable to the parties. The Debtors further agree that they shall not, without the prior written consent of the Indemnified Person (which shall not be unreasonably withheld) or approval of the Bankruptcy Court settle, compromise or consent to the entry of any judgment in any pending or threatened claim, action, suit or proceeding in respect of which indemnification may be sought hereunder, unless such settlement, compromise or consent includes an unconditional release of the Indemnified Person and each other Indemnified Person hereunder from all liability arising out of such claim, action, suit or proceeding. The Indemnified Person also may not, without the prior written consent of the Debtors or approval of the Bankruptcy Court settle, compromise or consent to the entry of any judgment in any pending or threatened claim, action, suit or proceeding in respect of which indemnification may be sought hereunder.

April 1, 2007
Page 6

In addition to the foregoing indemnification, any LTC Services personnel who may serve as an officer of the Debtors, including JT, shall be individually covered by the same indemnification and directors' and officers' liability insurance policy as is applicable to other officers of the Debtors. The Debtors shall cause JT and CVH (along with any other LTC Services personnel who become an officer of the Debtors) to be named as an "additional named insured" and as a "certificate holder" under any professional liability insurance policy so that any change to such policy or defect under such policy shall be noticed to them at the same time as it is noticed to the policy holder.

    6.   Non-Compete. JT, LTC Services and CVH all agree not to solicit, recruit or hire any of the Debtors' employees for a period of two (2) years subsequent to the completion or termination of this Agreement, unless such hiring is a result of general solicitations of employees via newspaper, internet, an undirected search, or other media.

    7.   Confidentiality. JT, LTC Services and CVH all agree to keep confidential all non-public information obtained from the employment by the Debtors. JT, LTC Services and CVH all agree that neither they, nor their respective officers, directors, members, principals, affiliates, independent contractors, employees or agents (the "Confidential Parties") will disclose to any other person or entity, expect to agents of the Debtors, or use for any purpose other than as specified herein, any information pertaining to the Debtors or any affiliate thereof which is either non-public, confidential or proprietary in nature ("Information") which he/she/it obtains or is given access to during the performance of the services provided hereunder. Confidential Parties may, however, make reasonable disclosure of Information to third parties in connection with their performance of their obligations and assignments hereunder, so long as such third parties, other than the Debtors' creditors, customers and advisors, are made aware of the nondisclosure terms and conditions of this Agreement and agree in writing to be bound to the same. In any event, Confidential Parties shall be held responsible for any breaches of the confidentiality provisions of this Agreement by any such third parties. In addition, for purposes of this Agreement, Information does not include information which (a) is generally available to the public other than as a result of a disclosure by the Confidential Parties, (b) was available to the Confidential Parties on a non-confidential basis prior to its disclosure to the Confidential Parties pursuant to this Agreement, or (c) becomes available to the Confidential Parties on a non-confidential basis from a source other than the Debtors, provided that the source is not bound by a confidentiality agreement with, or other obligation of confidentiality to, the Debtors.

In the event that any of the Confidential Parties are requested or required, by oral questions, interrogatories, request for information or documents, subpoena, civil investigative demand, court order or other process issued by a court of competent jurisdiction or any federal or state agency or administrative review board to which the Confidential Parties are or may be

April 1, 2007
Page 7

subject, to disclose any or all of the Information, the Confidential Parties will promptly provide written notice of same to the Debtors so that the Debtors may seek a protective order or other appropriate remedy. In no event will Confidential Parties disclose more than that portion of the Information that is legally required, as determined in writing by their counsel, and the Confidential Parties shall cooperate with the Debtors in their efforts to obtain a protective order or other assurance that the Information will not be disclosed, or, if it is disclosed, will be disclosed in such a manner as to limit to the greatest extent possible the number of persons who are granted access to the Information.

8.    Framework of the Engagement. The Debtors employment of JT, LTC Services and CVH shall not constitute an audit, review or compilation, or any other type of financial reporting engagement that is subject to the rules of the AICPA or other such state and national professional bodies. It is further understood and agreed that neither JT, LTC Services nor CVH guarantee in any respect the outcome of their engagement by the Debtors hereunder, or any level of recovery to the Debtors or to any creditor or stakeholder.

9.    Termination. JT may not be terminated as President and COO, nor have the scope of his duties or level of control altered or diminished, without the prior approval of the Bankruptcy Court after notice and a hearing. CVH may not be terminated as CCO, nor have the scope of her duties or level of control altered or diminished, without the prior approval of the Bankruptcy Court after notice and a hearing; provided, however, that, notwithstanding termination, JT and/or CVH, as the case may be, shall be entitled to any amounts due hereunder through the effective date of termination. Neither JT nor CVH may terminate his/her employment by the Debtors without the prior approval of the Bankruptcy Court after notice and a hearing, which may not occur on less than thirty days prior written notice to the Debtors, the Creditors Committee and the Debtors' secured creditors.

10.    Sale of Facilities. No sale of any of the Debtors' nursing home or residential care facilities may occur without the prior consultation with, and approval by, Emmanuel I. Bernabe, unless Mr. Bernabe refuses to provide such approval and the Bankruptcy Court approves such sale after notice and a hearing without the approval of Mr. Bernabe or over the objection of Mr. Bernabe.

11.    Plan of Reorganization. The Debtors may not propose or seek to confirm a plan of reorganization in their Chapter 11 cases without the prior consultation with, and approval by, Emmanuel I. Bernabe, unless Mr. Bernabe refuses to provide such approval and the Bankruptcy Court, after notice and a hearing, authorizes the Debtors to file and seek to confirm a plan of reorganization without the approval of Mr. Bernabe or over the objection of Mr. Bernabe.

April 1, 2007
Page 8

    12.    <u>Relationship of the Parties</u>.  The parties hereto intend that an independent contractor relationship will be created by this Agreement. JT, LTC Services and CVH, and their respective officers, members, principals, affiliates, subcontractors and agents are not to be considered employees or agents of the Debtors and are not entitled to any of the benefits that the Debtors provide for their employees, except as may otherwise be expressly provided for in this Agreement. This Paragraph shall not diminish or reduce JT's and CFH's fiduciary obligations as officers of the Debtors to the Debtors' employees, residents, and creditors. Further, JT and CFH shall be the duly appointed representatives of the Debtors in the Debtors' Chapter 11 cases.

    13.    <u>Assignability</u>.  The benefits of this Agreement shall inure to the benefit of the parties hereto, the successor and assigns of the parties hereto and the Indemnified Persons hereunder and their successors, assigns and representatives, and the obligations and liabilities assumed in this Agreement by the parties hereto shall be binding upon them and upon their successors and assigns. This Agreement may not be assigned without the prior written consent of the parties hereto.

    14.    <u>Entire Agreement</u>. This Agreement incorporates the entire understanding between the parties with respect to its subject matter and supersedes all previous agreements or understandings that might exist or have existed. This Agreement may not be amended or modified, except in writing, executed by the parties hereto.

    15.    <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the laws of the State of California, with giving effect to principles of conflicts of laws. Any and all disputes involving this Agreement shall be resolved solely the Bankruptcy Court presiding over the Debtors' Chapter 11 bankruptcy cases.

    16.    <u>Severability</u>.  Any provision of this Agreement that shall be determined to be invalid or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

    17.    <u>Counterparts</u>.  This Agreement may be signed in counterparts, and all such counterparts, taken together, shall be deemed to constitute a single original Agreement. Facsimile and electronically transmitted signatures to this Agreement shall have the same force and effect and original signatures.

    18.    <u>Survival</u>. The obligations of the parties pursuant to Paragraphs 3, 5, 6, 7, 8, 9, 13, 15 and 16 shall survive the termination of this Agreement along with any other section that expressly provides that it shall survive such termination.

April 1, 2007
Page 9


Dated:  April 1, 2007

THE FOREGOING IS APPROVED AND AGREED TO:

PLEASANT CARE CORPORATION
SNF PROPERTIES INCORPORATED
PCC HEALTH SERVICES, INC.
ATLAS CARE ENTERPRISES, INC.
EMBER CARE CORPORATION


By:_____
    Emmanuel I. Bernabe
    President

LTC SERVICES, L.L.C.


By:_____
    Joseph C. Tutera
    Manager

JOSEPH C. TUTERA


By:_____
    Joseph C. Tutera

CAROL VAN HORST


By:_____
    Carol Van Horst

Exhibit _B_, Page _80_

PLEASANT CARE
QUALITY PLAN
CHIEF CLINICAL OFFICIER

DEVELOP TEAM

Meet existing quality staff.
Bring known team members in to review and assist.
Review recent survey reports and deficiencies, verify current staffing patterns, obtain
information on key personnel in each facility, obtain current QI reports for each facility.
Prioritize facilities for focus.

DEVELOP COMMUNICATION PLAN FOR EXISTING EMPLOYEES, RESIDENTS
AND FAMILIES.

QUALITY REVIEW

Personally visit all facilities to interview existing staff, and assure resident care.
Review existing systems, augment as necessary.
Education to existing staff.
Make staffing decisions.
Send Customer Satisfaction Review to all existing families.

QUALITY FOLLOW-UP

Develop daily reporting tool, to be e-mailed which includes:
- Census
- Medicare A and HMO census
- Staffing numbers (to assure 3.2)
- Admissions
- Discharges, including where and why
- Change of Conditions
- Falls
- Skin issues
- Weight Loss
- Number of IVs
- Number on Therapy
- Number of Enteral Feedings

Develop immediate reporting tool (ALERT), to be e-mailed which includes:
- Any reports of abuse, including physical, mental, theft, and resident-to-resident.
- Any complaints and other surveyor visits.
- Upset families.

EXHIBIT 1

PLEASANT CARE
FINANCIAL PLAN

## FINANCIAL REVIEW

Develop Team
Meet existing financial team, bring in additional team members.
Review current financials.
Review current Accounts Receivable listing by payor type.
Determine collectibles.

## FINANCIAL FOLLOW-UP

Review billing, agings, and financial systems.
Develop daily reporting tool to report status of billing, collections, and staffing.
Review inventory control.
Review staffing patterns and staffing control in all departments.

BILL EVERYTHING POSSIBLE, COLLECT RECEIVABLES, CONTROL
EXPENSES.

Exhibit _B_, Page _82_

# Exhibit "C"

**Pleasant Care Corporation**

# Urgent Memo

**To:** Health Insurance Participants

**From:** Ruben Jauregui, Director of Human Resources

**Date:** August 14, 2007

**RE:** HEALTH INSURANCE BENEFITS

Through our pending bankruptcy cases and with the approval of the Bankruptcy Court, Pleasant Care Corporation and its affiliated companies (collectively, "PCC") have transferred substantially all of their facilities to new operators. There are a few remaining facilities that continue to be operated by PCC, but plans are being made for the transfer of these properties to new operators and should be completed shortly.

As PCC moves its business to new operators, we are making every effort humanly possible to ensure that the transitions are as seamless as possible. However, given many circumstances beyond our control, there are several matters pertaining to your medical benefits to which we wish to alert you.

First, it is very possible that, currently or in the very near future, your health insurance plan may no longer honor claims submitted for medical services received by you or your eligible family members. In such event, you or your medical provider may have claims against PCC's bankruptcy estates, but there is no assurance as to when or if these claims will be paid in full. While we have looked hard for a way to avoid this possible outcome, we have been unsuccessful to avoid this possible result.

Secondly, if you are an employee of a facility that is being (or will soon be) run by a new operator, there may or may not be a waiting period for medical coverage with your new employer. During this time, you may be entitled to receive COBRA benefits from PCC. However, as of this date, we are unable to determine with any certainty if PCC will be able to provide COBRA benefits to terminated employees. Therefore, we urge you to plan for this possibility as well.

As soon as we have any additional information regarding health insurance benefits or the availability of COBRA, we will let you know.

● Page 1

Exhibit C Page 83   09/24/2007 MON 13:38 [TX/RX NO 7495] ☑001

# Exhibit "D"



DELTA

HEALTH SYSTEMS
ADMINISTRATION SERVICES

Page 1
730-22982

CARMEN PRESTONFOO
65 WINDCREST LANE
SO SAN FRANCISCO  CA  94080

PLEASANT CARE REGION. OFFICE
PLEASANT CARE CORPORATION
1111 W ROBIN HOOD DR # W
STOCKTON CA  95207

## CERTIFICATE OF GROUP HEALTH PLAN COVERAGE

**\*IMPORTANT** - This certificate provides evidence of your prior health coverage. Under a federal
law known as HIPAA, you may need to furnish this certificate as evidence of your coverage to
reduce a pre-existing condition exclusion period under another plan, to help you get special
enrollment in another plan, or to obtain certain types of individual health coverage even if you have
a medical condition.

**Pre-existing condition exclusions.** Some group health plans restrict coverage for medical conditions
present before an individual's enrollment. These restrictions are known as "pre-existing condition
exclusions." A pre-existing condition exclusion can apply only to conditions for which medical
advice, diagnosis, care, or treatment was recommended or received within the 6 months before your
"enrollment date." Your enrollment date is your first day of coverage under the plan, or, if there is
a waiting period, the first day of your waiting period.  In addition, a pre-existing condition
exclusion cannot last for more than 12 months after your enrollment date (18 months if you are a
late enrollee).  Finally, a pre-existing condition exclusion cannot apply to a child who is enrolled in
health coverage within 30 days after birth, adoption, or placement for adoption.

If a plan imposes a pre-existing condition exclusion, the length of the exclusion must be reduced by
the amount of your prior creditable coverage. Most health coverage is creditable coverage,
including group health plan coverage, COBRA continuation coverage, coverage under an
individual health policy, Medicare, Medicaid and coverage through high-risk pools and the Peace
Corps.  Not all forms of creditable coverage are required to provide certificates like this one.  If you
do not receive a certificate for past coverage, talk to your new plan administrator.

You can add up any creditable coverage you have, including the coverage shown on this certificate.
However, if at any time you go more than 63 days without any coverage, a plan may not have to
count the coverage you had before the break. Therefore, once your coverage ends, you should try to
obtain other coverage as soon as possible to avoid a 63-day break in coverage.  You may use this
certificate as evidence of your creditable coverage to reduce the length of any pre-existing
condition exclusion if you enroll in another plan.

**Right to obtain special enrollment in another plan.**  Under HIPAA, if you lose your group health
plan coverage, you may be able to obtain coverage under another group health plan for which you
are eligible (such as a spouse's plan), even if the plan generally does not accept late enrollees, if
you request enrollment within 30 days. Therefore, once your coverage ends, if you are eligible for
coverage in another plan, you should request special enrollment as soon as possible.

Eligibility Department:  PO Box 1147, Stockton, CA  95201-1147

Phone 209-943-8493 • 800-123-6000 • P.  ---

Exhibit _D_, Page 84



DELTA
HEALTH SYSTEMS
ADMINISTRATION SERVICES

Page 2
730-22982

<u>Prohibition against discrimination based on a health factor.</u>  Under HIPAA, a group health plan may not keep you or your dependents out of the plan based on anything related to your health. Also, a group health plan may not charge you or your dependents more for coverage, based on health, than the amount charged a similarly situated individual.

<u>Right to individual health coverage.</u>  Under HIPAA, if you are an "eligible individual", you have a right to buy certain individual health policies without a pre-existing condition exclusion.  To be an eligible individual, you must meet the following requirements:

- You have had coverage for at least 18 months without a break in coverage of 63 days or more;

- Your most recent coverage was under a group health plan;

- Your group coverage was not terminated because of fraud or nonpayment of premiums;

- You are not eligible for COBRA continuation coverage or you have exhausted your COBRA benefits; and

- You are not eligible for another group health plan, Medicare or Medicaid and do not have any other health insurance coverage.

The right to buy individual coverage is the same whether you are laid off, fired or quit your job. Therefore, if you are interested in obtaining individual coverage and you meet the other criteria to be an eligible individual, you should apply for this coverage as soon as possible to avoid losing your eligible individual status due to a 63-day break.  Delta Health Systems does not provide individual health policies, however you may search for, compare and purchase individual and family plans through a link on the Delta Health Systems website.  Please visit our website at www.deltahealthsystems.com.

<u>State flexibility.</u>  This certificate describes minimum HIPAA protections under federal law.  States may require insurers and HMO's to provide additional protections to individuals in that state.

<u>For more information.</u>  If you have questions about your HIPAA rights, you may contact your state insurance department or the U. S. Department of Labor, Employee Benefits Security Administration (EBSA) toll-free 866-444-3272.  You may also contact CMS publication hotline at 800-633-4227.  These publications and other useful information are also available on the internet at: http://www.dol.gov/ebsa, the DOL's interactive web pages -Health Blaws, or http://www.cms.hhs.gov/hipaa1.

# DELTA ◢
## HEALTH SYSTEMS
### ADMINISTRATION SERVICES

Page 3
730-22982

Date of this certificate:   August 22, 2007

Name of group health plan:   PLEASANT CARE CORPORATION

Name of participant:   CARMEN PRESTONFOO

Identification number of participant:  730-22982

Name and address of plan administrator or issuer responsible for providing this certificate:

Delta Health Systems
P.O. Box 1147
Stockton, CA 95201-1147

For further information call:  Eligibility Department at 800-422-6099

Date waiting period or affiliation period (if any) began:

Dates of Coverage:   Medical:  February 1, 2007
Prescription Drugs:  February 1, 2007
Dental Care:  N/A
Vision Care:  N/A

Termination Date:  June 30, 2007

# Exhibit "E"

**Pleasant Care Corporation**

# Urgent Memo

**To:**    Health Insurance Participants

**From:**  Ruben Jauregui, Director of Human Resources

**Date:**  September 25, 2007

**RE:**    TERMINATION OF PLEASANT CARE CORPORATION'S SELF-INSURED HEALTH PLAN

This notice advises you that Pleasant Care Corporation's (PCC) Self-Insured Health Plan (Plan) officially terminated on June 30, 2007. Due to the termination, the Plan will be unable to provide or continue to provide COBRA benefits to participants effective as of the termination date (June 30, 2007). Despite substantial efforts by PCC to maintain the Plan, due to PCC's Chapter 11 case, cash constraints and factors outside the control of PCC, PCC was unable to keep the Plan going beyond June 30, 2007.

PCC will reimburse premium contributions made by eligible participants for the month of July 2007 within the next two weeks.

**If you have unpaid medical claims that you contend would have been covered (in full or part) by the Plan, we urge you to consult with an attorney on the rights afforded to you under all applicable laws, including, without limitation, the filing of claims in PCC's bankruptcy case. PCC previously sent you a notice that the Bankruptcy Court has set October 1, 2007 as a bar date for the filing of requests for allowance and payment of administrative claims. There is no assurance, however, that unpaid medical claims will be entitled to administrative status and PCC reserves the right to dispute all such claims. For reference purposes, the bankruptcy case number for PCC's Chapter 11 bankruptcy case is LA 07-12312-EC.**

● Page 1

Exhibit E Page 87